## In re WELLPOINT, INC. OUT–OF–NETWORK "UCR" RATES LITIGATION.

### No. MDL 09–2074 PSG (FFMx).

United States District Court,
C.D. California.

Sept. 6, 2012.

Christopher M. Burke, Kristen Marie Anderson, Scott & Scott LLP, Helen E. Zukin, Kiesel Boucher & Larson LLP, Artin Gholian, Brian S. Kabateck, Joshua H. Haffner, Kabeteck Kellner LLP, Los Angeles, CA, Christopher A. Seeger, Stephen A. Weiss, Diogenes Kekatos, James A. O'Brien, III, Seeger Weiss LLP, Joseph P. Guglielmo, Scott & Scott LLP, D. Brian Hufford, Robert J. Axelrod, Susan J. Weiswasser, Pomerantz Haudek Block Grossman And Gross LLP, Edith M. Kallas, Joe R. Whatley, Jr., Whatley Drake & Kallas LLC, New York, NY, James Robert Hail, John A. Lowther, IV, William James Doyle, II, Doyle Lowther LLP, Penelope Abdiel, Scott & Scott LLP, San Diego, CA, Andrew S. Friedman, Bonnett Fairbourn Friedman And Balint PC, Phoenix, AZ, Elizabeth J. Arleo, Arleo Law Firm PLC, Ramona, CA, Maria L. Weitz, Michael C. Eyerly, Raymond Paul Boucher, Kiesel Boucher Larson LLP, Beverly Hills, CA, Amanda F. Lawrence, Scott & Scott LLP, Colchester, CT, Lisa M. Burger, Mark N. Todzo, Lexington Law Group LLP, San Francisco, CA, W. Tucker Brown, Whatley Drake & Kallas LLC, Birmingham, AL, Martha J. Fessenden, Doffermyre Shields Canfield & Knowles, LLC, Atlanta, GA, for Plaintiffs.

E. Desmond Hogan, Miranda L. Berge, Peter R. Bisio, Craig A. Hoover, Hogan Lovells U.S. LLP, Washington, DC, Neil R. O'Hanlon, Robin J. Samuel, Hogan Lovells LLP, Los Angeles, CA, for Defendants.

**Proceedings: (In Chambers) Order Granting in Part and Denying in Part Defendants WellPoint, Inc., United HealthGroup, Inc., and Ingenix, Inc.'s Motions to Dismiss**

PHILIP S. GUTIERREZ, District Judge.

Wendy K. Hernandez, Deputy Clerk.

Pending before the Court are Defendants WellPoint, Inc., UnitedHealth Group, Inc., and Ingenix, Inc.'s Motions to Dismiss the Corrected Third Consolidated Amended Multi–District Litigation Complaint ("CTAC"). The Court finds the matters appropriate for decision without oral argument. *See* Fed.R.Civ.P. 78; L.R. 7–15. Having read and considered the moving and opposing papers, the Court GRANTS in part and DENIES in part the motions to dismiss.

I. *Background*

This case concerns insurance subscribers and healthcare providers who claim that the nation's largest healthcare insurer failed to properly reimburse them for covered out-of-network services ("ONS"). Plaintiffs allege that WellPoint—along with UnitedHealth Group ("UHG") and other Insurer Conspirators—orchestrated a scheme to artificially reduce and set "usual, customary, and reasonable" ("UCR") schedules for ONS reimbursements using the Ingenix Database, which UHG acquired through a wholly-owned subsidiary in 1998.[1] Subscribers were allegedly promised a "usual, customary, and reasonable" rate of reimbursement for services rendered by non-participating providers, but were underpaid due to "scrubbed" UCR data generated by Ingenix. The Insurer Conspirators who use the Ingenix Database for UCR reimbursement determinations collectively cover approximately 93.5 million privately-insured individuals in the United States. The factual background with respect to WellPoint's ONS coverage, the genesis and criticism of the Ingenix Database, and the procedural history of the present litigation is set forth in the Court's August 11, 2011 Order, 865 F.Supp.2d 1002 (C.D.Cal.2011), granting in part and denying in part Defendants' motion to dismiss the Second Consolidated Amended Complaint ("SAC"). *See* Dkt. # 243 (hereinafter, the *"August 11 Order"*).

Since early 2009, subscriber, provider and association plaintiffs have filed lawsuits against WellPoint, its subsidiaries, UHG, and Ingenix challenging WellPoint's use of the Ingenix Database and the adequacy of WellPoint's ONS reimbursements. These actions were consolidated into the current Multi–District Litigation, *In re WellPoint, Inc., Out–of–Network "UCR" Rates Litigation*, 2:09–ml–02074–PSG–FFM. Following issuance of the *August 11 Order*, Plaintiffs filed a Third Consolidated Amended Complaint on October 17, 2011, and a Corrected Third Consolidated Amended Complaint ("CTAC") on October 26, 2011. *See* Dkt. # 274, 279–1.

Like the SAC, the CTAC states causes of action for (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) unpaid benefits under group plans governed by ERISA, 29 U.S.C. § 1132(a)(1)(B); (3) breach of fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(2); (4) failure to provide full and fair review as required under ERISA, 29 U.S.C. § 1132(a)(3); (5) failure to provide accurate records under ERISA, 29 U.S.C. § 1132(c); (6) violation of RICO based on predicate acts of mail and wire fraud, 18 U.S.C. § 1962(c); (7) violation of RICO for predicate acts of embezzlement, 18 U.S.C. § 1962(c); (8) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (9) breach of contract; (10) breach of the implied covenant of good faith and fair dealing; (11) violation of California's unfair and deceptive practices statutes ("UCL" and "FAL"), Cal. Bus. & Prof. Code §§ 17200, 17500; and (12) violation of California's Cartwright Antitrust Act. *See* Dkt. # 279–1. Plaintiffs no longer pursue a claim for violation of New York General Business Law ("GBL") § 349,[2] but have added a claim for (13)

---

1. Ingenix and UHG will also be referred to collectively as the "UHG Defendants."

2. The GBL § 349 claim was brought on behalf of then-Subscriber Plaintiff Ivy Seigle–Epstein. Ms. Seigle–Epstein passed away during the pendency of the litigation and the Court granted Plaintiffs' motion to withdraw Ms. Seigle–Epstein as a Subscriber Class Representative on September 16, 2011. *See* Dkt. # 254. Accordingly, Plaintiffs have dropped the GBL § 349 claim "until such time as a suitable plaintiff may be substituted to pursue the claim on behalf of the New York Non–ERISA Subclass." *See* CTAC ¶ 28.

violation of the UCL's "unlawful" prong predicated on California Health and Safety Code § 1371.4, brought on behalf of Provider Plaintiff Dr. James G. Schwendig, a subclass of California Emergency Room providers, and the California Medical Association ("CMA") and American Medical Association ("AMA"). *See id.*

In asserting their various claims, Plaintiffs are divided into several categories. First, the "Subscriber Plaintiffs" are Michael Roberts ("Roberts") (on behalf of himself and as guardian for his daughter, D. Roberts), J.B.W. (a minor by and through his parent and guardian *ad litem*), Darryl and Valerie Samsell (the "Samsells"), Mary Cooper ("Cooper"), and Ivette Rivera–Giusti ("Rivera–Giusti"). *See id.* ¶¶ 24–29. The Subscriber Plaintiffs each allegedly had an insurance policy with WellPoint or one of its subsidiaries, received ONS medical care, were reimbursed at a depressed rate, and incurred "more out-of-pocket expense [than he or she] would have absent the unlawful conduct alleged." *See id.*

Second, the "Provider Plaintiffs" are as follows: Dr. Stephen D. Henry is a primary care internist, Dr. James G. Schwendig is a trauma surgeon, Dr. James Peck is a clinical psychologist, Dr. Michael Pariser is a licensed psychologist, Dr. Carmen Kavali is a plastic surgeon, Dr. Stephani Higashi is a chiropractic doctor, and the North Peninsula Surgical Center, L.P. ("NPSC") is an ambulatory surgical center. *See id.* ¶¶ 30–37. The Provider Plaintiffs allegedly provided ONS to WellPoint subscribers, were assigned the policies to be reimbursed, and received deflated UCR reimbursements. *See id.* ¶ 80.

Third, the "Association Plaintiffs" are the AMA, the CMA, the Medical Association of Georgia ("MAG"), the Connecticut State Medical Society ("CSMS"), the American Podiatric Medical Association ("APMA"), the California Chiropractic As-

sociation ("CCA"), and the California Psychological Association ("CPA"). *See id.* ¶¶ 38–51. The Association Plaintiffs sue Defendants in their individual and representative capacities to redress injuries sustained by them and their members. *See id.*

On December 22, 2011, WellPoint and the UHG Defendants filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. # 322, 323. Plaintiffs filed an omnibus opposition collectively opposing both motions. *See* Dkt. # 335. Defendants replied, and the motions are now before the Court.

■ As a threshold matter, the Court notes Plaintiffs' objection to many of WellPoint and the UHG Defendants' arguments on the grounds that they either were or could have been raised in connection with their motions to dismiss the Second Consolidated Amended Complaint and Defendants have not met the high reconsideration standards. However, the law is clear in this Circuit that an "amended complaint supersedes the original, the latter being treated thereafter as nonexistent." *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir.1997). Courts in this Circuit therefore have permitted defendants moving to dismiss an amended complaint to make arguments previously made and to raise new arguments that were previously available. *See In re Sony Grand WEGA KDF–E A10/A20 Series Rear Projection HDTV Television Litig.,* 758 F.Supp.2d 1077, 1098 (S.D.Cal.2010) ("When Plaintiffs filed the FACC, it superseded their previous complaint, and Sony was therefore free to move again for dismissal."); *Stamas v. Cnty. of Madera,* No. CV F 09–0753 LJO SMS, 2010 WL 289310, at *4 (E.D.Cal. Jan. 15, 2010) ("[A]n amended pleading is a new round of pleadings ... [and] is subject to the

same challenges as the original (i.e., motion to dismiss, to strike, for more definite statement)."); *Migliaccio v. Midland Nat'l Life Ins. Co.*, No. CV 06–1007 CAS-MANX, 2007 WL 316873, at *2–3 (C.D.Cal. Jan. 30, 2007) (rejecting plaintiffs' argument that Federal Rule of Civil Procedure 12(g)(2)'s ban on successive Rule 12 motions barred the defendants from raising new arguments or resurrecting arguments considered by the Court in their first motion to dismiss). Moreover, the CTAC contains new allegations relevant to the viability of several of Plaintiffs' causes of action, including allegations that WellPoint reimbursed some Subscriber Plaintiffs using methods other than the Ingenix database. Having chosen to amend their complaint in lieu of proceeding with their remaining claims, the CTAC supersedes the original and Defendants are not held to the reconsideration standards. *See Migliaccio*, 2007 WL 316873, at *3. With this in mind, the Court turns to the merits of Defendants' motions.

## II. *Legal Standard*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action if the plaintiff fails to state a claim upon which relief can be granted. In evaluating the sufficiency of a complaint under Rule 12(b)(6), the courts must be mindful that the Federal Rules of Civil Procedure require that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, the U.S. Supreme Court has instructed that a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In resolving a Rule 12(b)(6) motion, the Court must first accept as true all non-conclusory, factual allegations made in the complaint. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Based upon these allegations, the Court must draw all reasonable inferences in favor of the plaintiff. *See Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir.2009). After accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the Court must then determine whether the complaint alleges a plausible claim to relief. *See Iqbal*, 129 S.Ct. at 1950. In determining whether the alleged facts cross the threshold from the possible to the plausible, the Court is required "to draw on its judicial experience and common sense." *Id.* "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

## III. *Discussion*

The Court first addresses the standing issues raised in WellPoint and the UHG Defendants' motions, before evaluating the sufficiency of the individual claims pleaded in the CTAC.

### A. *Plaintiffs' Standing*

Defendants again make several challenges to the Subscriber, Provider, and Association Plaintiffs' Article III and statutory standing. Article III standing is a jurisdictional prerequisite to a federal court's consideration of any claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff in federal court must show three things: (1) injury-in-fact;

(2) causation, and (3) redressibility. *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

WellPoint challenges (1) all Plaintiffs' standing as it relates to "ONS benefit reductions" calculated via non-Ingenix methodologies, (2) the Provider Plaintiffs' assignment-based right to bring claims under ERISA, 29 U.S.C. § 1132(a)(2) and (a)(3), the Sherman Act, RICO, and the UCL/FAL, and (3) the Association Plaintiffs' representative standing under ERISA, the Sherman Act, and RICO in the event their members lack standing, and both their representative and individual standing under the UCL/FAL. *See WellPoint Mot.* 6:2–12:11. Finally, both WellPoint and UHG challenge all Plaintiffs individual statutory standing under the Sherman Act and RICO. The Court addresses each in the order set forth above.

### 1. *Standing of Plaintiffs to Assert non-Ingenix "ONS Benefit Reduction" Claims*

■ In the *August 11 Order,* the Court dismissed all Plaintiffs' claims to the extent they were based on "ONS Benefit Reductions" unrelated to Ingenix reimbursement schedules. The Court agreed with Defendants that Plaintiffs had failed to "allege any facts to establish that they have standing to bring claims for [non-Ingenix] ONS Benefit Reductions." In dismissing these claims, the Court concluded that Plaintiffs failed to identify which individuals were affected by the non-Ingenix ONS benefit reductions, and how each was injured.

The CTAC now identifies Subscriber Plaintiff J.B.W. and several Provider Plaintiffs as having been reimbursed for ONS using in-network participating fee schedules, *see* CTAC ¶ 231 (Schwendig); ¶ 240 (Peck); ¶ 248 (Pariser); ¶ 262 (Kavali); ¶ 361 (Higashi), and Subscriber Plaintiffs the Samsells as having been reimbursed according to a multiple of Medicare fee schedules. *See* CTAC ¶ 345. The CTAC describes the Non–Ingenix methodologies employed by WellPoint to calculate ONS reimbursement and explains why each methodology is flawed in that it results in ONS reimbursements that do not reflect reasonable and customary charges. *See* CTAC ¶¶ 16, 174–77, 275. These allegations are sufficient to cure the deficiencies identified by the Court. Accordingly, WellPoint's motion to dismiss all Plaintiffs' claims for lack of standing to the extent they are based on non-Ingenix ONS under-reimbursements is DENIED.

### 2. *Provider Plaintiffs' Standing to Sue via "Assignments of Benefits"*

■ WellPoint challenges the Provider Plaintiffs' standing to sue via the assignments they received from their patients for violations of (1) any provision of ERISA other than § 1132(a)(1)(B), (2) the Sherman Act, (3) RICO, and (4) the UCL/FAL. *See WellPoint Mot.* 6:1–12. The assignments the Providers received expressly relate to the right to receive benefits. *See* CTAC ¶ 219 ("Dr. Henry's patients sign a form assigning their health benefits to him"); ¶ 234 ("Dr. Peck has obtained assignments of benefit payment rights from insureds"); ¶ 237 (referring to the "assignment of benefits forms" that "Dr. Peck and Provider Class members obtain from their WellPoint patients"); ¶ 244 ("The assignment of benefits that Dr. Pariser and Class members obtain from their WellPoint patients are security for future payment by WellPoint"); ¶ 256 ("In each case, Dr. Kavali [obtains] from the patient [a] signed Assignment of Benefits form").

Recovery for non-payment of benefits is governed by section 1132(a)(1)(B) of ERISA, which provides a cause of action "by a participant or beneficiary to recover benefits due to him under the terms of his

plan." *See* 29 U.S.C. § 1132(a)(1)(B). The Ninth Circuit has long recognized that assignments of benefits are sufficient to convey standing on an assignee to sue a plan directly under § 1132(a)(1)(B). *See Misic v. Bldg. Serv. Emps. Health & Welfare Trust,* 789 F.2d 1374, 1376 (9th Cir.1986). However, WellPoint contends that mere assignments of benefits give no indication that the assignor intended to assign its right to bring causes of action under the Sherman Act, RICO, the UCL/FAL and other provisions of ERISA, such as §§ 1132(a)(2) and (a)(3), which do not relate to benefits reimbursements.[3] Accordingly, WellPoint argues the Provider Plaintiffs lack standing to assert these claims by assignment. Plaintiffs apparently misinterpret this argument, responding in large part with the well-established—and uncontested—rule that providers who receive benefits assignments may sue directly under § 1132(a)(1)(B). *See Opp.* 54:1–28.

■ The Court's task in interpreting the scope of an assignment is to "enforce the intent of the parties." *See Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1283 (9th Cir. 1983); *Nat'l Reserve Co. of Am. v. Metro. Trust Co. of Cal.,* 17 Cal.2d 827, 832, 112 P.2d 598, 602 (1941) ("In determining what rights or interest pass under an assignment, the intention of the parties as manifested in the instrument is controlling.").

With respect to the ERISA causes of action, the Provider Plaintiffs rely almost exclusively on *Misic* and the Eleventh Circuit's decision in *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1350 (11th Cir.2009), both of which involved claims for unpaid benefits brought under section 1132(a)(1)(B) and which therefore did not address whether assignments of the right to reimbursement were effective to assign claims under §§ 1132(a)(2) and (a)(3) as well. *See Misic,* 789 F.2d at 1378; *Conn. State Dental,* 591 F.3d at 1350–53. Looking to the language of the assignments and the intentions of the parties as pleaded in the CTAC, the Court concludes that the Provider Plaintiffs have failed to allege they were assigned the right to bring these causes of action.

■ First, the Ninth Circuit has recently reiterated that courts must look to the language of an ERISA assignment itself to determine the scope of the assigned claims. *See Eden Surgical Ctr. v. B. Braun Med., Inc.,* 420 Fed.Appx. 696, 697 (9th Cir.2011) (noting that the "question [was] whether the plan participants assigned Eden the right to sue for statutory penalties" and concluding that the language of the assignments did not encompass the right to bring claims under § 1132(c)). Here, the assignments as pleaded are limited to the right to collect benefits. *See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.,* 7 F.Supp.2d 79, 84 (D.Mass.1998) (noting that a "Benefits Assignment Form" enabled a Plaintiff to sue for services rendered, but "accomplishe[d] little else"). Moreover, at least

---

**3.** Section 1132(a)(2) provides a cause of action *on behalf of the plan* for breach of certain duties imposed upon an ERISA fiduciary as set forth in 29 U.S.C. § 1109. *See LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 254, 256, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) (section 1109 "does not provide a remedy for individual injuries distinct from plan injuries"). Section 1132(a)(3) provides a "catch all" cause of action for injunctive or "other appropriate equitable relief" to redress, enjoin, or enforce ERISA or the provisions of an applicable plan. *See Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (describing § 1132(a)(3) as a "safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy"). The Provider Plaintiffs do not explain why § 1132(a)(1)(B) alone does not provide an adequate remedy.

one Circuit taking up the issue has concluded that "only an express and knowing assignment of an ERISA fiduciary breach claim [under § 1332(a)(2) ] is valid." *See Texas Life, Accident Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't Co.,* 105 F.3d 210, 218 (5th Cir.1997) ("Because an assignment of a fiduciary duty breach claim affects all plan participants, and unsuccessful claims can waste plan resources ... these claims are not assigned by implication or by operation of law."). Plaintiffs argue that courts generally do not distinguish between which subsection of § 1132(a) an assignee proceeds, and that the language in *Misic* to the effect that the provider in that case could "assert the *claims* of his assignors" is broad enough to encompass the right to bring claims under other subparts of § 1132(a). However, this does not avail the Provider Plaintiffs here because the complaint in *Misic* alleged that "Dr. Misic 'stands in the shoes of the [b]eneficiaries.'" *See Misic,* 789 F.2d at 1378. Under California law, when an assignee "stands in [the] shoes" of the assignor, he takes "all the rights of the assignor" and has exclusive rights to sue on the assigned claims. *Johnson v. Cnty. of Fresno,* 111 Cal.App.4th 1087, 1096, 4 Cal.Rptr.3d 475 (2003); *accord Eden,* 420 Fed.Appx. 696, 698 (Bybee, J., dissenting). No such allegation is pleaded here.

■ Second, the CTAC itself alleges that the assignments "do not alter the legal relationship between WellPoint and its subscribers, but rather provide the convenience of allowing these subscribers to obtain needed healthcare on the implicit promise of later payment by WellPoint." *See* CTAC ¶ 243. Once a claim has been assigned, however, the assignee is the owner and the assignor generally lacks standing to sue on it. *See DevTech Mktg., Inc. v. Westfalia–Surge, Inc.,* No. EDCV 02–672 RT (SGLx), 2005 WL 6287929, at *4 (C.D.Cal., Apr. 19, 2005); *cf. Klamath–Lake,* 701 F.2d at 1283 (not-

ing that "had the assignors sought to save their claims for later use," they would not have employed language effectuating a full assignment of all claims). Accordingly, allegations emphasizing the maintenance of existing legal relations between the subscribers and WellPoint weigh against a broad construction of the scope of the assignments. Tellingly, the ERISA Subscriber Plaintiffs themselves state causes of action under §§ 1132(a)(2) and (a)(3). Because the scope of the assignments as pleaded is limited to the right to collect benefits payments directly, the CTAC indicates that the ERISA Subscribers intended to maintain existing legal relationships with WellPoint notwithstanding the assignments, and the Subscriber Plaintiffs also collectively state claims under §§ 1132(a)(2) and (a)(3), the Court finds the allegations insufficient to conclude that the Provider Plaintiffs were assigned the right to pursue these claims. Accordingly, the §§ 1132(a)(2) and (a)(3) claims brought on behalf of the Provider Plaintiffs are DISMISSED.

■ For similar reasons, the Court concludes that the Provider Plaintiffs have not adequately alleged they were assigned their subscriber-patients' rights to bring antitrust and RICO causes of action. Although "terms of art are not required for a valid assignment," *U.S. ex. rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993), the Ninth Circuit has nevertheless acknowledged "the unique concerns underlying antitrust assignments." *Knott v. McDonald's Corp.,* 147 F.3d 1065, 1068 n. 4 (9th Cir.1998) (citing *Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 437–39 (3d Cir.1993)). In *Gulfstream III,* the Third Circuit reasoned that problems of split recoveries and duplicative liability lent "crucial support" to the holding that "any assignment of antitrust claims, as a matter of federal common law,

must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims." *See* 995 F.2d at 440; *Korea Kumho Petrochemical v. Flexsys Am. LP,* 2007 WL 2318906, at *3 n. 2 (N.D.Cal., Aug. 13, 2007) (noting that federal antitrust assignments must be express). Since Section 4 of the Clayton Act, 15 U.S.C. § 15, served as the model for the provision of the RICO statute authorizing private civil actions, 18 U.S.C. § 1964, courts have likewise held that RICO assignments must be "express." *See Lerman v. Joyce Intern., Inc.,* 10 F.3d 106, 112 (3d Cir.1993). Applying this standard, assignments conveying "all of" the assignor's "causes of action, ... claims and demands of whatsoever nature," have been held sufficient, while those that merely assign the "rights, title and interest" in the subject of the agreement have been held deficient. *See id.*

The assignments in this case, which concern only the right to collect ONS reimbursements directly from the assignor's insurer, fail to affect even a general assignment and therefore cannot meet the more demanding antitrust and RICO requirements. Because the CTAC does not allege that the Provider Plaintiffs obtained "express" assignments to pursue antitrust and RICO claims on behalf of their patients, the Providers lack standing to assert these claims via assignment, and these claims, too, are DISMISSED.

■■■■ WellPoint's argument that the assignments are insufficient to convey standing upon the Provider Plaintiffs to assert UCL/FAL causes of action on behalf of the subscriber-assignors differs from those discussed above. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice...." Cal. Bus. & Prof. Code § 17200. In 2004, the California electorate amended the UCL/FAL to provide that private enforcement

actions may be brought only by one "who has suffered injury in fact and has lost money or property as a result of the unfair competition." *Amalgamated Transit Union, Local 1756 v. Superior Court,* 46 Cal.4th 993, 1000, 95 Cal.Rptr.3d 605, 209 P.3d 937 (2009) (discussing Cal. Bus. & Prof. Code § 17204); *accord Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 321–22, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) (discussing Proposition 64 and Cal. Bus. & Prof. Code §§ 17204 and 17535). Citing to *Amalgamated Transit,* WellPoint urges the Court to adopt a rule that UCL/FAL claims may not be brought by assignment. Applying § 17204 to an association that conceded it had not itself suffered "actual injury under the unfair competition law," but which held assignments from its injured members, the California Supreme Court in *Amalgamated Transit* held that "[t]o allow a *noninjured assignee* of an unfair competition claim to stand in the shoes of the *original, injured claimant* would confer standing on the assignee in direct violation of the express statutory requirement in the unfair competition law, as amended by the voters' enactment of Proposition 64, that a private action under that law be brought exclusively by a 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'" *See* 46 Cal.4th at 998, 1002, 95 Cal.Rptr.3d 605, 209 P.3d 937. Rather, "all unfair competition law actions seeking relief on behalf of others ... must be brought as class actions." *See id.* at 1005, 95 Cal.Rptr.3d 605, 209 P.3d 937.

The Provider Plaintiffs counter that *Amalgamated Transit* does not bar their UCL claims based on the assignments they received from their subscriber-patients because, unlike the plaintiff-association in *Amalgamated,* they have suffered their own injuries in fact. *See Opp.* 58:19–22 ("Provider Plaintiffs who were under-

paid for their services on account of Well-Point's ONS under-reimbursements suffered injury.") (citing CTAC ¶¶ 156–57, 160, 218–70). In so far as the Provider Plaintiffs suffered their own independent and direct injuries "as a result of" the unfair competition, they may pursue their own UCL claims. However, the problem with the Provider Plaintiffs' argument is that to the extent they sue via assignment, they seek to recover derivatively for the injuries inflicted upon their subscriber-patients, and not their own injuries. *See Drazan v. Atlantic Mut. Ins. Co.*, 2010 WL 2629576, at *3 (N.D.Cal. Jun. 29, 2010) (rejecting assignee-plaintiffs argument that they had standing to sue on behalf of an injured assignor because they themselves had "incurred a diminution in value of their interest in [the assignor] as a result of defendants' conduct." Because plaintiffs were "not suing based upon their own claims," but were instead "suing as assignees of [the assignor's] claims for defendants' failure to defend and indemnify [the assignor]," they lacked standing.). The Provider Plaintiffs do not purport to represent a class comprised of both the injured Subscribers and themselves, which would require a showing of, among other things, a "well-defined community of interest" between these two groups. *See Arias v. Superior Court*, 46 Cal.4th 969, 977 n. 2, 95 Cal.Rptr.3d 588, 209 P.3d 923 (2009). The Court concludes that to allow the Provider Plaintiffs to sue on behalf of the injured subscriber-assignors simply because they have suffered their own distinct injuries would run counter to *Amalgamated Transit's* pronouncement that all UCL actions seeking to recover for injuries inflicted on others must be brought as class actions. Accordingly, the Provider Plaintiffs' assignment-based UCL/FAL claims are DISMISSED.

In sum, the Court finds that the CTAC fails to plead that the Provider Plaintiffs were assigned the right to bring claims under §§ 1132(a)(2) and 1132(a)(3) of ERISA, the Sherman Act, and RICO. Accordingly, to the extent the Provider Plaintiffs pursue such claims via assignment, they are DISMISSED. Further, because all unfair competition claims "seeking relief on behalf of others," including those brought via assignment must satisfy the class action requirements, the Provider Plaintiffs assignment-based UCL/FAL claims, too, are DISMISSED.

### 3. *Association Plaintiffs*

■■■ The Court previously found that the Association Plaintiffs had standing to pursue their individual and representative claims. However, the Court has now found that the Provider Plaintiffs lack standing to pursue their assignment-based Sherman Act and RICO claims. Because an association can only have representative standing if its "members would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), to the extent the Association Plaintiffs' Sherman Act and RICO claims are brought on behalf of members suing by assignment, the Association Plaintiffs also lack representative standing to pursue such claims.

■■■ WellPoint also argues that the Association Plaintiffs lack individual and representative standing under the UCL and FAL because representative standing is no longer permitted under § 17204 and the Associations' alleged injuries—increased counseling expenses and diverted resources, *see* CTAC ¶ 163—are too nebulous and attenuated to satisfy § 17204's requirement that a plaintiff have lost money or property as a result of the unfair competition. *See* Cal. Bus. & Prof. Code § 17204. With respect to the Association Plaintiffs' representative standing, the Court agrees. As alluded to above, the California Supreme Court established in

two companion cases handed down in 2009 that representative actions for UCL and FAL violations must be brought as class actions. *See Arias v. Superior Court*, 46 Cal.4th 969, 978–80, 95 Cal.Rptr.3d 588, 209 P.3d 923 (2009) ("we construe the statement in section 17203, as amended by Proposition 64, that a private party may pursue a representative action under the unfair competition law only if the party 'complies with Section 382 of the Code of Civil Procedure' to mean that such an action must meet the requirements for a class action."); *Amalgamated Transit*, 46 Cal.4th at 1005, 95 Cal.Rptr.3d 605, 209 P.3d 937 ("Plaintiff unions challenge the Court of Appeal's conclusion that all unfair competition law actions seeking relief on behalf of others, including those brought by representative or associational plaintiffs, must be brought as class actions. We agree with the Court of Appeal."). Accordingly, because the UCL and FAL no longer permit associational or representative standing and the Association Plaintiffs do not attempt to meet the class action requirements, their representative UCL/FAL claims are DISMISSED. *See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 452 F.Supp.2d 924, 939 (N.D.Cal.2006); *Amalgamated Transit*, 46 Cal.4th at 1004, 95 Cal.Rptr.3d 605, 209 P.3d 937 (§ 17204's "standing requirement is inconsistent with the federal doctrine of associational standing.").

However, the Court rejects WellPoint's perfunctory argument that the Associations' alleged injury is insufficiently concrete to support individual standing under § 17204. WellPoint does not develop this argument or cite any authority on point, and at least one court in this district has held on analogous facts that the requisite showing of injury to money or property caused by unfair competition had been made. *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F.Supp.2d 1061, 1069 (C.D.Cal.2005) (find-

ing Housing Rights Center had evidenced an injury sufficient to support a UCL claim based on loss of financial resources in investigating claim and diversion of staff time from other cases) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Accordingly, WellPoint's motion to dismiss the Association Plaintiffs' individual UCL/FAL claims for lack of standing is DENIED.

### 4. *Antitrust Standing*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. The CTAC alleges violations of Section 1 of the Sherman Act on behalf of all Plaintiffs under both a rule of reason and a *per se* analysis. The Court previously upheld Plaintiffs *per se* and rule of reason claims. In so holding, the Court noted that several of Defendants' arguments appeared to be directed at Plaintiffs' standing, but that standing to assert the Sherman Act claims was not specifically raised in the papers. *See August 11 Order*, p. 1030–31. This question is now squarely before the Court, however, as both WellPoint and the UHG Defendants argue that Plaintiffs have not suffered a direct injury of the type the antitrust laws were intended to forestall, and therefore lack standing to pursue their claims.

Antitrust standing is a jurisdictional prerequisite to a Section 1 claim under both the rule of reason and the *per se* rule. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 744 (9th Cir.2012) ("Because Plaintiffs lack antitrust standing, we do not address Plaintiffs' appeal regarding the district court's [ ] determination that the rule of reason, and not the per se rule, applies here"). Under § 4 of the Clayton Act, "any person who shall be injured in his business or property by rea-

son of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). However, "[t]he Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits." *Del. Valley Surgical Supply Inc. v. Johnson & Johnson,* 523 F.3d 1116, 1120 (9th Cir.2008) (citing *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)); *accord Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1054 (9th Cir.1999) (noting that § 4 is not to be read to "afford relief to all persons whose injuries are causally related to an antitrust violation," rather, "courts have constructed the concept of antitrust standing, under which they 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,' [in order] to determine whether a plaintiff is a proper party to bring an antitrust claim."). As a result, "[a]ntitrust standing is distinct from Article III standing," and a "plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Id.* at 1054 n. 3. The issue may be raised at any stage of litigation. *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 145 (9th Cir.1989).

██ The Supreme Court has identified certain factors for determining whether a plaintiff who has borne an injury for Article III standing has suffered injury for antitrust purposes. *Am. Ad Mgmt.,* 190 F.3d at 1054. These factors include: (1) the nature of the plaintiff's alleged injury; that is, whether it is the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Amarel v.*

*Connell,* 102 F.3d 1494, 1507 (9th Cir. 1996); *accord Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

██ Although Courts have stated that "no single factor is decisive," *R.C. Dick Geothermal,* 890 F.2d at 146, and that it is "virtually impossible to announce a black-letter rule that will dictate the result in every case," *Am. Ad Mgmt.,* 190 F.3d at 1054, the first factor is of such "tremendous significance" in determining whether a plaintiff has antitrust standing that its presence is necessary, though not always sufficient. *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 n. 3 (9th Cir.1985); *accord Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 372 (9th Cir.2003) ("to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'").

██ The second, fourth and fifth factors are dispositive of the Provider and Association Plaintiffs' claims. The "directness of the injury" inquiry incorporates traditional limitations of proximate causation. *See Ass'n. of Wash. Publ. Hosp. Dists. v. Philip Morris Inc.,* 241 F.3d 696, 701 (9th Cir.2001). "A direct relationship between the injury and the alleged wrongdoing has been one of the 'central elements' of the proximate causation determination, and 'a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [ ] generally [has been] said to stand at too remote a distance to recover." *Id.* (quoting *Oregon Laborers–Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957, 963 (9th Cir. 1999)). Also relevant to this inquiry is the *Illinois Brick* rule, which bars an indirect purchaser from recovering based on an illegal price fix in the upstream market, even where the direct purchaser simply

passes on the illegal price to the indirect purchaser. *See In re ATM Fee Antitrust Litig.,* 686 F.3d at 748 ("In other words, indirect purchasers may not use a pass-on theory to recover damages and thus have no standing to sue.").

■ To determine whether an injury is "too remote" to allow recovery under the antitrust laws, courts consider three factors: "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Ass'n. of Wash. Pub. Hosp. Dists.,* 241 F.3d at 701 (quoting *Oregon Laborers,* 185 F.3d at 963). These factors overlap with the fourth and fifth *Associated General* factors, which are also concerned with eliminating duplicative recoveries and avoiding difficulties in apportioning damages.

Applying this three-factor test, it is plain that the Provider and Association Plaintiffs cannot establish antitrust standing. First, there exist more direct victims in the form of the Subscribers. Without the under-reimbursements to the Subscribers, the Providers would not have encountered difficulty in collecting a usual, customary, and reasonable rate for services rendered to their Subscriber-patients. In other words, there is no "direct link" between the harm the Provider Plaintiffs suffered and Defendants' alleged misconduct, which is entirely derivate of the injury inflicted on the Subscribers. *See Oregon Laborers,* 185 F.3d at 963 (holding that hospital districts and trusts seeking to recover their increased expenditures for treatment of their beneficiaries' tobacco-related illnesses that were caused by the tobacco defen-

dants' wrongdoing lacked standing because "without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers."). The Association Plaintiffs' injuries are even more attenuated. First the Subscribers must be under-reimbursed and the Providers must encounter friction in collecting the balance of their billed-charges, then the Providers must decide to seek counseling from the Associations, who in turn must incur additional expenses. In sum, because the harm suffered by the Provider and Association Plaintiffs merely flows from the misfortunes visited upon the Subscribers by WellPoint and the Insurer Conspirators' acts, the proximate cause requirement is not met. *See id.* at 964; *see also Ass'n. of Wash. Publ. Hosp. Dists.,* 241 F.3d at 702.

Moreover, as the Subscribers are also plaintiffs in this action, they clearly are motivated to punish the defendants for their wrongdoing. Even if the Subscriber Plaintiffs are ultimately unable to "vindicate the public interest in antitrust enforcement," their ability to bring other claims to deter the defendants' wrongful conduct, including state law claims, satisfies this factor and weighs against standing. *See Oregon Laborers,* 185 F.3d at 964. Here, the Subscriber Plaintiffs assert a myriad of claims seeking to punish WellPoint for its ONS under-reimbursements, including claims for nonpayment of benefits under ERISA § 1132(a)(1)(B) and state law breach of contract.

Second, ascertaining the Provider and Association Plaintiffs' damages attributable to WellPoint's wrongful conduct would entail considerable speculation regarding how the Subscribers would have behaved had WellPoint accurately disclosed its ONS reimbursement metrics, including whether a subscriber would have selected a different ONS provider or an in-network

provider, or would have agreed to pay the balance had they been informed of the lower ONS reimbursement figures upfront. *See Ass'n. of Wash. Publ. Hosp. Dists.*, 241 F.3d at 703 (holding district court correctly concluded that the speculative nature of the harm weighed "strongly against" standing where "[c]alculation of the Hospital Districts' damages would entail considerable speculation regarding how individuals' tobacco usage would have changed in the event that accurate information and less harmful tobacco products were available"). Finally, the potential for duplicative recovery weighs against standing given that the Subscriber Plaintiffs' causes of action for breach of contract and nonpayment of benefits under ERISA section 1132(a)(1)(B) seek recovery for the same under-reimbursements. *See id.*

In sum, the Provider and Association Plaintiffs cannot show that their injuries were proximately caused by Defendants' alleged misconduct. Therefore, they lack standing under the Sherman Act and their claims are DISMISSED WITH PREJUDICE. And because RICO incorporates the same proximate causation inquiry, the Provider and Association Plaintiffs' RICO causes of action, too, are DISMISSED WITH PREJUDICE. *See Ass'n. of Wash. Publ. Hosp. Dists.*, 241 F.3d at 701; *Holmes v. Sec. Investor Pro. Corp.*, 503 U.S. 258, 268–74, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–58, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (applying *Holmes* and holding that RICO plaintiffs' theory that defendants "harmed [them] by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers" was insufficient to confer standing because the "direct victim of this conduct was the State of New York," not plaintiffs); *Rezner v. Bayerische Hypo–Und Vereinsbank AG*, 630 F.3d 866, 874 (9th Cir.2010).

The Court's antitrust standing analysis with respect to the Subscriber Plaintiffs is less straightforward, however. WellPoint and UHG challenge the Subscriber Plaintiffs' antitrust standing on the grounds that have failed to plead facts establishing the first—and critical—*Associated General* factor: "Antitrust injury." Antitrust injury demands a showing of: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't*, 352 F.3d at 372 (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055). In addition, Courts generally impose a fifth requirement that the injured party be a participant in the same market as the alleged malefactors. *Id.* "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (quoting *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538 (9th Cir.1987)). Courts have recognized "a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants." *Am. Ad Mgmt.*, 190 F.3d at 1057 fn. 5.

The CTAC identifies the restrained market as the "market for data used to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services (the 'Data Market')" in the United States. *See* CTAC ¶ 86; *Opp.* 14:15–17; *accord Opp.* 15:26 ("The ONS market [ ] is not the relevant antitrust market."). Plaintiffs admit that they do not participate in the Data Market, but claim they nonetheless suffered an antitrust injury "because the anticompetitive effects of Defendants' conspiracy to manipulate the Data market occur in the ONS market, to which the

Data Market is inextricably linked." *Id.* 15:26–16:1.

In essence, Plaintiffs' antitrust theory is that control over the Data Market was essential to the Conspirators' scheme to depress UCR reimbursements because the presence of other more accurate benchmarking products would have revealed the systematic suppression of UCRs in the linked ONS reimbursement market. *See* CTAC ¶ 85. Defendants acquired control over the Data Market structurally through a series of acquisitions that eliminated competition and left Ingenix with a 75% market share. *See id.* They then ensured ongoing control of the market by purportedly agreeing not to submit claims data to competitors or potential competitors of Ingenix. *Id.* ¶¶ 85, 90. From there, barriers to entry and deep discounts by Ingenix to insurers who submitted the most data allowed Ingenix to maintain its dominance. *Id.* As a result, no competitive data producers emerged. " 'By agreeing to joint control and administration of the Data market, the Insurer Conspirators are able to assure that the reimbursements they pay in the Linked ONS Market will be artificially depressed,' thereby causing injury to Plaintiffs." *Opp.* 16:23–17:1 (quoting CTAC ¶ 87, 89).

Were Plaintiffs direct consumers of UCR data or potential competitors of Ingenix, these allegations might suffice to plead antitrust injury. However, the Subscribers fail to explain how their injuries— decreased ONS reimbursements in the "ONS Market"—"flow[ ] from that which makes [D]efendants' acts unlawful" under the antitrust laws, *i.e.* Defendants' exclusion of competitors from the Data Market. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). It "is not enough [ ] to show that defendants violated the law and that the plaintiffs suffered a causally related injury. The critical question for

determining whether there is antitrust injury is whether the harm is of the kind that antitrust laws were meant to protect against." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir.2001). Injuries that are derivative from the alleged conduct or where causation is highly speculative are not an appropriate basis for an antitrust claim. *Am. Ad Mgmt.*, 190 F.3d at 1055; *accord Illinois Brick*, 431 U.S. at 735, 97 S.Ct. 2061 (holding that only direct purchasers have standing to sue).

Plaintiffs' opposition and the CTAC contain only speculative and conclusory assertions that increased competition among data producers would have resulted in the development of "more accurate benchmarking products," which in turn "would have revealed the systematic suppression of UCRs in the Ingenix schedules," and that "Plaintiffs received lower reimbursements because Defendants' UCR rates were not 'set by free competition,' but, rather, by Defendants' scheme to skewer downwards the UCR data used to calculate ONS reimbursements." *See Opp.* 17:7–28; 19:9–14; CTAC ¶ 85. The Subscribers' injuries allegedly were caused by WellPoint and the Insurer Conspirators submitting and relying on flawed data in calculating their ONS reimbursements, and, in some cases, further reducing these figures by reference to internal and Medicare fee schedules "which will always reimburse at a lower amount than the Ingenix method." *See Opp.* 14:10–11 (citing TCAC ¶¶ 80, 84, 87, 110, 388, 495). But the Subscribers fail to explain how this loss "flows from an *anticompetitive* aspect or effect of the [Defendants'] behaviour." *See Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir.1995); *Atl. Richfield Co.*, 495 U.S. at 343, 110 S.Ct. 1884 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reduc-

ing aspect or effect of the defendant's behavior."). It is the Insurer Conspirators who are consumers in the data market, not the Subscriber Plaintiffs. The plausibility of Plaintiffs' conspiracy theory hinges on their assertion that the Insurer Conspirators benefit directly from decreased ONS reimbursement expenses, rendering a scheme to depress UCR schedules generated in the data market attractive. *See* CTAC ¶ 87 ("For every dollar the Insurer Conspirators are able to decrease their reimbursement costs through their unlawful conspiracy [in the Data Market], there is a corresponding dollar increase to the affected [subscriber's] healthcare costs."). It is therefore not self-evident that "free competition" and the emergence of new entrants in the data market, who would also be competing for the business of insurance companies and relying on the billed-charge data they submitted, would result in an *increase* in the UCR rates generated or the development of "more accurate benchmarking products." *See Dominguez v. UAL Corp.,* 666 F.3d 1359 (D.C.Cir.2012) (rejecting even Article III standing where plaintiffs' theory of antitrust injury "pile[d] speculation atop speculation" in assuming that United Airlines "would continue to offer discounted tickets if it could no longer price discriminate"); *Summit Tech., Inc. v. High–Line Med. Instruments, Co., Inc.,* 922 F.Supp. 299, 304 (C.D.Cal.1996) ("[A] Court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations.").

Moreover, several of Plaintiffs' allegations elsewhere cut against a determination that their injuries are attributable to a breakdown of competitive conditions in the Data Market. First, one of the primary criticisms leveled against the Ingenix database—its reliance on only four data points—dates back to the establishment of the PHCS database as early as 1973, twen-

ty-five years before Ingenix acquired its dominant position in the Data Market. *See* CTAC ¶¶ 99–102. Second, Plaintiffs cite favorably to the State of New York's adoption of a "new, independent database to be run by a non-profit organization" (the "NYAG database") that will replace the Ingenix database. *See* CTAC ¶¶ 91, 145–46. Once the NYAG database is operational, insurers allegedly will have 60 days to cease operating and using the Ingenix Database. *Id.* ¶ 146. Even though this new database is intended to simply replace Ingenix and therefore makes no changes to the competitive landscape, Plaintiffs claim that it will "free consumers and healthcare providers from the trap of the Ingenix conspiracy." *See id.* But whatever its social merits, replacing one monopolist with another, particularly one that, as a non-profit, is designed to be immune from certain market forces, is not about redressing harm to competition and therefore is beyond the purview of the antitrust laws. *See Brunswick Corp.,* 429 U.S. at 488, 97 S.Ct. 690.

In sum, because the CTAC does not plausibly explain how increased competition in the data market would raise the level of ONS reimbursements, the Subscribers have failed to plead an "antitrust injury" flowing directly from a competition-reducing aspect of Defendants' conduct. *See Franco v. Conn. Gen. Life Ins. Co.,* 818 F.Supp.2d 792, 839 (D.N.J.2011). At best, Plaintiffs have alleged that a lack of competition in the Data Market was a "but for" cause of their injuries in that it prolonged discovery of Defendants' fraudulent activities. *See Opp.* 19:9–12 ("Through ... the assurance of opacity on the methodology used to calculate ONS reimbursements, Defendants were able to increase the price subscribers paid for ONS and thus reduce their own costs."). The Court agrees that while "[t]his alleged misconduct may state a claim for relief

under other legal theories ... it does not confer standing upon Plaintiffs to sue for any alleged restraint of trade in the Data Market." *Franco*, 818 F.Supp.2d at 839; *accord Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. 690 ("while respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful.").

Further, the Court agrees with UHG's contention that Plaintiffs, who admit they do not participate in the Data Market, "cannot fit within the 'narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants.' " *See UHG Mot.* 6:6–19; *Am. Ad Mgmt.*, 190 F.3d at 1057, n. 5 (noting that even those parties "whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury," unless they fall within the narrow exception to this rule applicable to "parties who[se] injuries are 'inextricably intertwined' with the injuries of market participants") (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)); *accord Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745–46 (9th Cir.1984).

There are several deficiencies in the Subscribers' linked market theory. First, the "linked ONS market" is inadequately defined and is problematic in that there is no allegation that a provider who is out-of-network under one Insurer Conspirator's plans will be out-of-network under another's. *See Franco*, 818 F.Supp.2d at 840 n. 22 (rejecting linked market theory in part because the complaint failed to identify what interchangeable products or services the ONS market comprises, and there was "no allegation, nor [could] any reasonable inference be drawn, that a provider who is [out-of-network] for one insurance company is also [out-of-network] for all other

insurance companies"). Second, even assuming a market for ONS reimbursements exists, the TCAC's conclusory allegations fail to establish the "close and continuous link" between the two markets required to support antitrust standing. *See Amarel*, 102 F.3d at 1512. Although the Ninth Circuit has indicated that injuries inflicted upon a truly linked market may be sufficiently direct to confer standing, recovery predicated on a "linked market theory" is generally limited to those who have been injured in a physical goods market by a restraint imposed on the futures market for the same good, or vice versa, and cases involving vertically integrated products in which competition for a necessary component has been restrained. *See, e.g., Amarel*, 102 F.3d at 1512 (discussing *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918 (7th Cir.1995), which addressed an illegal Board of Trade resolution directing holders of "long" positions in soybean futures to liquidate their positions, causing a price decline in both the soybean futures market and the soybean cash market, in which plaintiffs were sellers. Because, accepting the plaintiffs' allegations as true, the "cash and futures markets for soybeans are so closely related that a directive issued toward one promised to invariably impact the other," plaintiffs injuries suffered in the soybean cash market were sufficient to confer antitrust standing.); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 476 (7th Cir.2002); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir.2002); *In re Digital Music Antitrust Litig.*, 812 F.Supp.2d 390, 402–03 (S.D.N.Y.2011).

The CTAC fails to adequately explain how the monopolization of the Data Market would *invariably* affect consumers in the market for ONS reimbursements, and the CTAC's new allegations that WellPoint also makes UCR determinations by reference to Medicare and In–Network fee schedules, which reimburse at rates even

lower than the Ingenix figures, suggests that the markets do not automatically and necessarily move in lockstep. *Cf. Sanner,* 62 F.3d at 929 (reasoning that a linked market may support antitrust standing where it "tends to move in lockstep" with the restrained market and is " 'so closely related' that the distinction between them is of no consequence to antitrust standing analysis"); *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 402–03 (rejecting linked market theory asserted by purchasers of CD music because they merely alleged that Defendants' conduct of artificially inflating the price of internet music allowed them to sell CDs at supracompetitive prices, they did not explain how a lack of competition in the internet music market *necessarily* increased the price of CD music).

The Subscribers' "linked market" theory rests on the Supreme Court's decision in *Blue Shield of Va. v. McCready,* which the Subscribers submit requires a finding of antitrust injury here. However, *McCready* is distinguishable from the present case on several key grounds. Carol McCready was a Blue Shield subscriber who sought the professional services of a non-physician clinical psychologist for a mental and nervous disorder. *See McCready,* 457 U.S. at 468, 102 S.Ct. 2540. Purportedly due to an illegal conspiracy between psychiatrists and Blue Shield to exclude psychologists from the psychotherapy market, Blue Shield refused to cover her services. *Id.* McCready then sued Blue Shield and the Neuropsychiatric Society of Virginia under Section 1 of the Sherman Act. *Id.* at 469–70, 102 S.Ct. 2540. After outlining the defendants' anticompetitive scheme to restrict competition in the psychotherapy market, the Supreme Court noted that the damages for which McCready sought recovery were "the consequence of Blue Shield's attempt to pursue that scheme." *Id.* at 483, 102 S.Ct. 2540.

McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends [in the psychotherapy market]. The harm to McCready and her class . . . was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely " 'the type of loss that the claimed violations . . . would be likely to cause.' "

*Id.* at 479, 102 S.Ct. 2540 (quoting *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690) (internal quotation marks omitted).

Because the "heart" of Blue Shield's scheme was to exclude psychologists by offering its subscribers, *i.e.,* the psychologists' customers, the "Hobson's choice" of either forfeiting reimbursement or electing to be treated by a psychiatrist, the "injury [McCready] suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 483–84, 102 S.Ct. 2540. Moreover, "permitting [McCready] to proceed . . . offer[ed] not the slightest possibility of a duplicative exaction from petitioners," as McCready had paid her psychologist's bills, and thus her psychologist could "link no claim of injury to himself." *Id.* at 475, 102 S.Ct. 2540.

*McCready* therefore "created a limited exception to the rule that an antitrust claim must be asserted by a market participant; it applies when injuries are 'inextricably intertwined' with *a market participant's.*" *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 402–03 (emphasis

added). The same circumstances are not present here. First, McCready was a customer in the relevant market. Courts have recognized the ability of customers suffering injury as a result of unlawful restraints in the relevant market to sue. *See Glen Holly*, 352 F.3d at 372 ("Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."). Second, Plaintiffs' analogy to *McCready* puts the cart before the horse on the facts of this case. Unlike Blue Shield's refusal to reimburse in *McCready*, the payment of depressed UCRs to the Subscribers was not the mechanism through which the Insurer Conspirators sought to achieve their anticompetitive goals in the relevant market. To the contrary, by Plaintiffs' own allegations the Data Market was manipulated as a necessary step in the conspiracy to under-reimburse subscribers in the ONS market. Therefore, unlike McCready, the injury to Plaintiffs here was not inextricably intertwined with the harm Defendants sought to inflict on the relevant market or competitors within that market. The Subscribers do not explain how the payment of depressed UCRs in the ONS market had any impact on competition or competitors in the Data Market, and, in fact, the Insurer Conspirators' inputs into the Data Market were based on billed-charge data, not ONS reimbursement figures. Further, it is not inconceivable that actual participants in the Data Market would seek to recover under the antitrust laws for the competitive harm they suffered, thereby presenting the risk of duplicative exaction expressly dis-

claimed in *McCready*. Because the harm the Subscribers suffered is distinct from any harm inflicted upon participants in the Data Market, be they insurance companies who were overcharged for or denied access to Ingenix data or potential new market entrants who were excluded, *McCready* is distinguishable and does not support a finding of antitrust injury. *See In re Digital Music Antitrust Litig.*, 812 F.Supp.2d at 403 (distinguishing *McCready* and rejecting linked market theory because "both CD purchasers and Internet Music purchasers allegedly were harmed by higher prices of CDs and Internet Music, respectively, and CD purchasers' alleged injury [was] thus distinct from and not intertwined with Internet Music purchasers' injury").

In sum, the CTAC identifies the relevant market as the Data Market. The Subscriber Plaintiffs, however, fail to explain how their injuries flow inexorably from Defendants' efforts to reduce competition in that market such that they are of the type the antitrust laws were intended to forestall. Moreover, Plaintiffs have neither alleged that they participate in the relevant market nor shown that their harm was inextricably intertwined with the harm the conspirators sought to inflict on that market or competitors within that market. Therefore, Plaintiffs fail to plead an antitrust injury sufficient to confer standing, and the Subscribers' Sherman Act causes of action are DISMISSED. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 346, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).[4]

---

**4.** The Cartwright Act "is California's version of the federal Sherman Act and sets forth California's antitrust laws." *Cellular Plus, Inc. v. Superior Court of San Diego County*, 14 Cal.App.4th 1224, 1232, 18 Cal.Rptr.2d 308 (1993). Standing under the Cartwright Act is broader than standing under the Sherman Act insofar as the Cartwright Act explicitly permits indirect purchasers to bring suits for damages and injunctive relief. *Id.* at 1234, 18 Cal.Rptr.2d 308; *accord Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 763, 111 Cal.Rptr.3d 666, 233 P.3d 1066 (2010) ("[I]n direct response to *Illinois Brick*, the [California] Legislature amended the state's Cartwright Act ([Cal.] Bus. & Prof. Code[] § 16700 *et seq.*) to provide that unlike federal law, state law per-

Having resolved the standing issues raised by WellPoint and the UHG Defendants, the Court turns to an analysis of the sufficiency of the CTAC's remaining causes of action.

### B. *RICO Causes of Action Brought on Behalf of the Subscriber Plaintiffs*

The Court next considers Plaintiffs' sixth, seventh, and eighth causes of action for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* The CTAC states RICO violations predicated on (1) mail fraud on behalf of all Plaintiffs against all Defendants, (2) embezzlement on behalf of all ERISA Plaintiffs and the AMA against all Defendants, and (3) conspiracy to violate RICO, 18 U.S.C. § 1962(d), on behalf of all Plaintiffs against all Defendants. However, as the Court has already determined that the Provider and Association Plaintiffs lack standing to pursue their RICO causes of action, either via assignment or in their own right, the Court considers the sufficiency of the Subscriber Plaintiffs' RICO allegations only.

### 1. *Participation in a RICO Enterprise—18 U.S.C. § 1962(c)*

Section 1962(c) of RICO states that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). For a plaintiff to state a claim under § 1962(c), he or she must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir.2008). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497–98, 105 S.Ct. 3275; *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir.2007).

The Court previously dismissed Plaintiffs' RICO claims predicated on mail fraud on the grounds that they had failed to

---

mits indirect purchasers as well as direct purchasers to sue."). Nonetheless, a plaintiff must still prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Cellular Plus*, 14 Cal.App.4th at 1234, 18 Cal. Rptr.2d 308; *Langer Juice Company, Inc. v. Yantai North Andre Juice Co., Ltd.*, No. CV 06–1354 SVW (CWx), 2006 WL 5207229, at *2 (C.D.Cal. Aug. 16, 2006) ("the Cartwright Act does require that Plaintiff plead an injury that is the type of injury that the antitrust laws target, the first and most important factor in federal antitrust standing[.] If Plaintiff does not allege an antitrust injury, that is the end of the inquiry") (citations omitted). Moreover, such injury must · not be "secondary, consequential, or remote, but the direct result of the unlawful conduct." *Cellular Plus*, 14 Cal.App.4th at 1233, 18 Cal.Rptr.2d 308 (citing *Kolling v. Dow Jones & Company, Inc.*,

137 Cal.App.3d 709, 717, 187 Cal.Rptr. 797 (1982)) ("Plaintiff's injuries were not 'secondary' or 'consequential,' since they did not result from injury to third parties; they were not 'remote,' for they were the direct result of the allegedly illegal conduct."). Accordingly, having failed to plead an "injury of the type the antitrust laws were intended to prevent," the Cartwright Act's more liberal standing requirements do not avail Plaintiffs here, and this cause of action, too, is DISMISSED. Moreover, the Provider and Association Plaintiffs' Cartwright Act causes of action are subject to dismissal for the additional reason that, as discussed *supra*, their injuries "result from injury [to the Subscribers,]" and therefore are merely "secondary" or "consequential." *See Kolling*, 137 Cal.App.3d at 717, 187 Cal.Rptr. 797; *accord Lorenzo v. Qualcomm Inc.*, 603 F.Supp.2d 1291, 1302–03 (S.D.Cal. 2009).

plead that WellPoint conducted the affairs of the enterprise, and because they failed to plead even third-party reliance on any of Defendants' alleged misrepresentations. *See August 11 Order*, p. 1035, 1038–40. The Court also found that Plaintiffs had failed to plead the requisite two acts of racketeering activity on the part UHG and Ingenix necessary to satisfy the "pattern" requirement. *See id.*, p. 1043–44. Both WellPoint and UHG maintain that the CTAC fails to cure these deficiencies.

### i. *Defendants' "Conduct"*

As with the SAC, WellPoint again argues that the CTAC fails to plead that they directed the affairs of the enterprise. *See WellPoint Mot.* 23:23–25:17; *UHG Mot.* 10:2–11:11. As previously noted, liability for participating in the "conduct" of a RICO enterprise extends only to those who "have some part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In the RICO context, "directing" has a different meaning than is commonly understood. A defendant need not be in charge of or have "significant control over or within [the] enterprise." *Reves*, 507 U.S. at 179 n. 4, 113 S.Ct. 1163 (citation omitted). However, more is required than "simply being involved," and "[s]imply performing services for the enterprise does not rise to the level of direction." *Walter*, 538 F.3d at 1249. Similarly, "is not enough that [a defendant] failed to stop illegal activity." *Id.* at 1248. Relevant considerations include whether the defendant "occup[ies] a position in the 'chain of command'... through which the affairs of the enterprise are conducted," whether the defendant "knowingly implement[ed] the decisions of upper management," and whether the defendant's "participation was 'vital' to the mission's success." *See id.* at 1249. Finally, RICO liability requires a "showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,'

not just their *own* affairs." *Reves*, 507 U.S. at 185, 113 S.Ct. 1163.

In the *August 11 Order*, the Court noted that Plaintiffs' allegation that "WellPoint and UnitedHealth 'knowingly participated in the formation and maintenance of the Ingenix Database'" was "as specific as Plaintiffs [got] with respect to WellPoint Defendants' RICO conduct." *See August 11 Order*, p. 1034. Elsewhere in the SAC were allegations similar to the following: "WellPoint and UnitedHealth participated [in] and conducted the affairs of the enterprise not only by submitting false and incomplete data to Ingenix, but by being involved in decision making regarding the database and by utilizing the flawed data for [the] illicit purpose of determining UCR[s]." *Id.* The Court noted that the submission of its own data did not plausibly show that WellPoint controlled the other members in the associated-in-fact enterprise; all it really established was that WellPoint was acting on its own when submitting data to the Ingenix database. *Id.* Moreover, "the existence of a business relationship between WellPoint, Ingenix, and the Insurance Defendants without more does not show that WellPoint conducted the enterprise." *Id.* (citing *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727–28 (7th Cir.1998) (holding that an established business relationship between the defendants and the enterprise was insufficient to state a claim that the defendants directed the affairs of the alleged fraudulent marketing enterprise)). Finally, the Court noted that although "Plaintiffs' conclusory statement that 'WellPoint and UnitedHealth ... [were] involved in decision making regarding the database' does suggest RICO conduct," it was "too general to satisfy *Twombly's* pleading instructions." *See August 11 Order*, p. 1035 (citing *Kearney v. Foley & Lardner*, 05–cv–2112–L(LSP), 2011 WL 1119020, at *6 (S.D.Cal. Mar. 28, 2011)).

Plaintiffs argue that the CTAC's RICO "conduct" allegations now plead that "Defendants held managerial-level positions that enabled them to have a part in directing the enterprise's affairs, including the database." *See Opp.* 21:1–2. Taking into account the new and old allegations, the relevant facts pleaded in the CTAC are as follows.

During the relevant time period, WellPoint executives held upper management level positions with the HIAA, an industry oversight organization that includes "virtually every major health insurer in the United States," CTAC ¶ 98, and later with the AHIP, its successor organization. *See* CTAC ¶ 104. Beginning in 1973, "various committees within HIAA, composed of HIAA members," developed and managed a billed-charge database that became known as the PHCS database. *Id.* ¶ 99. The PHCS database became the largest such database in the country, and HIAA "*via* its committees and Board of Directors" "consciously decided to limit the amount of information it received from contributors" to four data points. *Id.* ¶ 101.

In October 1998, "the members of HIAA (including WellPoint) agreed to sell the PHCS to Ingenix for an undisclosed amount." *Id.* ¶ 104. The CTAC now pleads that Leonard Schaeffer, the then-CEO of WellPoint, was the number two official in charge of the HIAA at this time. *Id.* Under the terms of the sale, HIAA and Ingenix agreed to have member companies participate in an ongoing Ingenix PHCS Advisory Committee, "which would have input as to what data Ingenix used and how Ingenix used it." *Id.* Accompanying the sale to Ingenix, the HIAA and Ingenix agreed to a 10–year Cooperation Agreement which provided the HIAA with "continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form

of a 'Liaison Committee' to advise and evaluate Ingenix." *Id.* ¶ 106.

Notably absent, however, are any allegations that WellPoint ever served on either the Advisory or the Liaison Committees that "had input" into the data used by Ingenix and played a role in advising and evaluating the database. Moreover, with the exception of the additional fact that WellPoint's then-CEO was second in command of the HIAA at the time the PHCS database was sold to Ingenix and held the position of Chairman on the HIAA's Board of Directors for at least the first year following its sale, each of these allegations was included in the SAC. And while the CTAC now alleges that "[b]ecause WellPoint's CEO was the Chairman of HIAA in the year immediately following the sale, he and others working with him at WellPoint necessarily had ongoing responsibility for the implementation of the database," CTAC ¶¶ 105, 302, this allegation is materially indistinct from the SAC's conclusory statement that "WellPoint and United-Health ... [were] involved in decision making regarding the database," which the Court previously found insufficient. *See August 11 Order*, p. 1035; *accord Summit Tech., Inc. v. High–Line Med. Instruments Co., Inc.*, 922 F.Supp. 299, 304 (C.D.Cal.1996) ("[A] court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations."). Similarly, while the CTAC now pleads that various other high-ranking officers at WellPoint served on the board of directors of the HIAA/AHIP from 1998 to the present, Plaintiffs still fail to tie any of these executives or WellPoint's involvement in the HIAA to any decision-making regarding or direct involvement with the Ingenix database. *See* CTAC ¶¶ 98, 304.

Aside from the allegations detailed above, the CTAC's remaining facts again

pertain to WellPoint's submission of "scrubbed" data and use of flawed data in its own UCR determinations. *See* CTAC ¶ 305. But as the Court previously noted, the submission of its own data does not plausibly show that WellPoint controlled the other members in the associated-in-fact enterprise. And as before, the existence of a business relationship between WellPoint, Ingenix, the Insurance Defendants, and the HIAA/AHIP, of which Plaintiffs admit "virtually every major health insurer in the United States" is a member, CTAC ¶ 98, without more, does not show that WellPoint directed the enterprise. Having again failed to plead any non-conclusory facts showing that WellPoint played "some part in directing the enterprise's affairs," as opposed to "simply being involved" in them, the CTAC again fails to plead that WellPoint conducted the enterprise and the Subscribers' RICO causes of action against WellPoint are DISMISSED.

■ However, the Court agrees that Plaintiffs adequately plead that the UHG Defendants conducted the enterprise. The CTAC plausibly explains how Ingenix's involvement "was 'vital' to the mission's success." *See Walter*, 538 F.3d at 1248. First, Ingenix controls 75% of the market for UCR data. *See* CTAC ¶ 73. Moreover, the CTAC does not merely allege that Ingenix provided deficient services. *Cf. Walter*, 538 F.3d at 1248. Rather, Ingenix is alleged to have played an active and crucial role in directing the submission of "scrubbed" data by the Insurer Conspirators and aggregating, scrubbing and manipulating the data to create the false UCR schedules. *See* CTAC ¶¶ 72–73. These schedules were then sold back to the same health insurers, making Ingenix the "primary instrument used to accomplish" the enterprise's scheme. *See Walter*, 538 F.3d at 1249 (citing *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir.1995) to

show that the refusal to deal by two contractors constituted management or operation of an enterprise because "they were part of the enterprise itself, they knowingly undertook the predicate acts 'at the direction' of the enterprise's management, and they were 'vital to the achievement of the enterprise's primary goal, as only they had the ability to exclude [plaintiff] from the market' "). Finally, the CTAC pleads that Ingenix is a wholly-owned subsidiary of UHG, and thus plausibly alleges that UHG occupied a "position in the chain of command" through which the affairs of Ingenix, and therefore the enterprise, were conducted. CTAC ¶ 6; *see also Walter*, 538 F.3d at 1249; *LSJ Inv. Co. v. O.L.D., Inc.*, 167 F.3d 320, 324–325 (6th Cir.1999) (holding allegations that first individual defendant was controlling shareholder and owner of one corporation at the time of plaintiff's dealing with defendants, and that second individual defendant was controlling shareholder and owner of second corporate defendant were sufficient to plead direction of an enterprise involving the corporations under the standard announced in *Reves*, 507 U.S. at 184, 113 S.Ct. 1163).

ii. *"Pattern" of "Racketeering Activity" by UHG Defendants*

A "pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after [1970] and the last of which occurred within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity is any act indictable under several provisions of Title 18 of the United States Code, including mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and embezzlement from pension and welfare funds under 18 U.S.C. § 664. *See* 18 U.S.C. § 1961(1)(B); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir.

2010). Plaintiffs' RICO causes of action are based on mail and wire fraud and embezzlement.

### a. *Mail and Wire Fraud*

To state a claim for mail and wire fraud, a plaintiff must plead, in addition to the other elements of a RICO claim, "(1) a scheme or artifice devised with (2) the specific intent to defraud and (3) use of the United States mail or interstate telephone wires in furtherance thereof." *Orr v. Bank of Am.*, 285 F.3d 764, 782 (9th Cir.2002). Although RICO itself is not subject to the heightened pleading standards of Federal Rule of Civil Procedure ("FRCP") 9(b), predicate acts alleging fraud must be pleaded with particularity. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065–66 (9th Cir.2004). In the context of a fraud suit involving multiple defendants, a plaintiff must also "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.1989).

The allegations in the CTAC regarding the predicate acts of mail and wire fraud are based on requests by Ingenix for data from WellPoint and confirmations that data was either received by Ingenix or sent by WellPoint. *See* CTAC ¶ 312. Plaintiffs submit that these predicate transmissions involve use of the mails and wires, and therefore supply the mailing element, but do not argue that the transmissions themselves were fraudulent. Rather, the "fraudulent act" was "the underlying scheme to defraud involving manipulation of data via the centralized Ingenix Database," to which the predicate transmissions were incident. *See Opp.* 26:10–27:6. In other words, the Subscribers do not contend that there was anything false or misleading regarding the requests for data or confirmations themselves.

Plaintiffs are correct that " 'innocent' mailings—ones that contain no false information—may supply the mailing element." *See Schmuck v. United States*, 489 U.S. 705, 714–15, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The predicate transmissions do not have to be alleged as false or contain misrepresentations; they need only be in furtherance of a scheme to defraud. *See Bridge v. Phx. Bond & Indemn. Co.*, 553 U.S. 639, 647, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) ("Mail fraud, in turn, occurs whenever a person 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.' [ ] The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element[,]' even if the mailing itself 'contain[s] no false information[.' ]") (quoting *Schmuck*, 489 U.S. at 712, 109 S.Ct. 1443). "Naturally, if such allegations are made, the complaint need not specify the precise nature of the misleading statements. It must still, however, particularly describe the scheme and how the communications, although facially innocent, furthered that scheme." *In re Managed Care Litig.*, No. 00–1334–MD, 2009 WL 812257, at *8 (S.D.Fla. Mar. 26, 2009).

The Court agrees that the transmissions pleaded were "incident to an essential part of the scheme" such that they may satisfy the mailing element. *See Schmuck*, 489 U.S. at 711–12, 109 S.Ct. 1443 (holding that the mailing of title registration forms by unwitting dealers to whom defendant had sold tampered vehicles satisfied the mailing requirement because the scheme was a "fairly large-scale operation" involving 150–plus vehicles and a span of at least 15 years, the Defendant sold the tampered vehicles to dealers on a repeat basis, and the scheme would have "come to an abrupt halt if the dealers" had not been able to resell the cars obtained from Schmuck. Therefore, "although the registration-form

mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."), *cited approvingly in Bridge*, 553 U.S. at 647, 128 S.Ct. 2131.

The alleged scheme to defraud plaintiffs here was considerably larger than the scheme in *Schmuck*, and, like that case, it is alleged to have lasted over a decade. As in *Schmuck*, the CTAC adequately explains why the continued submission of large amounts of data by the Insurer Conspirators during this period was essential to the ongoing success of the venture. *See* CTAC ¶¶ 74, 308. The predicate acts identified, which include confirmation emails regarding data submissions by Ingenix and WellPoint, instructions for future submissions, and, importantly, an email from Ingenix's Data Contribution department notifying WellPoint that it was behind on its submissions and reminding WellPoint that it was required to submit data biannually, are thus incident to an essential part of the scheme. Therefore, the CTAC adequately identifies predicate mailings by Ingenix.

▪ However, the Court agrees with UHG that Plaintiffs fail to identify any predicate acts committed by UHG. As previously noted, "[w]here RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant." *See August 11 Order*, p. 1035 (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *Keel v. Schwarzenegger*, CV 08–7591 RMT (VBK), 2009 WL 1444644, at *6 (C.D.Cal. May 19, 2009)). The CTAC contains only conclusory references to "countless and nearly constant acts of mail and wire fraud" by UHG. *See, e.g.*, CTAC ¶¶ 297, 300, 314. Such statements fail to satisfy Rule 9(b).

Plaintiffs first argue that because the *August 11 Order* stated that Plaintiffs had not pleaded predicate acts by "UHG *or* Ingenix" and referred to the "UHG Defendants" collectively, it did not require Plaintiffs to plead predicate mailings by both Ingenix *and* UHG. But the *August 11 Order* clearly stated that "at least two predicate acts by *each* defendant" were required. *See August 11 Order*, p. 1036 (emphasis in original). A party that relies on its own strained interpretation of a Court order does so at its own peril. Moreover, given the "countless and nearly constant acts of mail and wire fraud" in which UHG purportedly engaged, the Court does not find it unreasonable to require Plaintiffs to properly identify two acts of racketeering activity on the part of UHG. *See, e.g.*, *Dooley v. Crab Boat Owners Ass'n*, No. C 02–0676 MHP, 2004 WL 902361, at *5 (N.D.Cal. Apr. 26, 2004) (noting that in order to satisfy the pattern requirement under RICO "each defendant must have committed at least two predicate acts within ten years" and analyzing whether each of the several defendants independently met this standard).

In sum, the CTAC adequately pleads a "pattern" of mail fraud against Ingenix, but not UHG. For this reason, the Subscribers' RICO causes of action predicated on mail fraud are DISMISSED against UHG. Moreover, because this is Plaintiffs' second opportunity, and second failure to meet this requirement, dismissal in this instance is WITH PREJUDICE.

b. *Mail and Wire Fraud Reliance and Proximate Causation*

▪ An injury "by reason of" a RICO violation requires plaintiffs "to show that a RICO predicate offense 'not only was a 'but for' cause of [their] injury, but was the proximate cause as well.' " *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010)

(quoting *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311). "When a Court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). The Subscriber Plaintiffs allege RICO injury in the form of having "overpaid for health insurance coverage due to false reimbursement rates." *Opp.* 29:7–9.

The Parties dispute at length whether the Subscribers must prove reliance in order to meet the proximate causation requirements. Citing to *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), Plaintiffs argue that "[r]eliance [ ] is not an element of a RICO claim." *See Opp.* 28:15–16. However, *Bridge* simply emphasized that the key inquiry is proximate causation—*i.e.,* whether the injury occurred "as a result of" the RICO violation—and acknowledged that under certain schemes, including the one before it, "a person [could] be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *See Bridge,* 553 U.S. at 649, 128 S.Ct. 2131. Therefore, where a showing of first-party reliance is not "necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate cause principles articulated in *Holmes* and *Anza,*" it need not be pleaded. *Id.* at 657–58, 128 S.Ct. 2131. However, as the Court noted in the *August 11 Order,* "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentation." *See id.* at 658, 128 S.Ct. 2131 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.").

*Bridge* does not avail the Subscriber Plaintiffs here because unlike the scheme alleged in that case, proof that Defendants' scheme to depress ONS reimbursements proximately caused the Subscribers' injuries will depend on a showing that class members selected insurance policies based on WellPoint's misrepresentations regarding its ONS coverage. That the CTAC now identifies data transmissions between Ingenix and the Insurer Conspirators as the predicate mailings does not alter the fundamental character of Defendants' fraudulent scheme or change the fact that this is a case where proof of reliance, and likely first-party reliance, is "a mile post on the road to causation." *See Negrete v. Allianz Life Ins. Co.,* No. CV 05–6838 CAS (MANx), 2011 WL 4852314, at *11 n. 8 (C.D.Cal. Oct. 13, 2011) (internal quotation marks omitted) (rejecting the plaintiffs' claim that they were not required to plead reliance based on Bridge because "proof that Allianz's alleged deceptive scheme proximately caused class members to suffer a concrete financial loss will depend on a showing that class members made investment decisions based on material misinformation or omissions about the annuity products marketed to them") (quoting *Poulos v. Caesars World, Inc.,* 379 F.3d 654, 664 (9th Cir.2004)). Accordingly, reliance on some aspect of Defendants' fraudulent scheme must be pleaded and eventually proved.

With respect to RICO reliance, the CTAC contains only the lone conclusory allegation that "to the extent that a showing of reliance is required, Provider Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by providing ONS to WellPoint subscribers and on the validity of the assignments given to them by Subscriber Plaintiffs and Subscriber Class members." *See* CTAC ¶ 319. As regards the Subscribers, Plaintiffs do not direct the Court to any allegations of

reliance whatsoever. Having once again failed to plead reliance in any form, the Subscribers' RICO causes of action predicated on mail fraud are DISMISSED.

### 2. RICO Predicated on Embezzlement

 The Court previously declined to dismiss the ERISA Subscribers' embezzlement-based RICO cause of action. WellPoint's lone argument in favour of dismissal at that time was that embezzlement is the act of fraudulently converting *another person's* property, while Plaintiffs' allegations failed to show how WellPoint converted anyone's assets. Relying on *United States v. Andreen,* 628 F.2d 1236 (9th Cir.1980), the Court rejected WellPoint's interpretation of 18 U.S.C. § 664 as unduly narrow.[5] *Andreen* recognized that while embezzlement traditionally encompassed "the fraudulent appropriation of the property of another," section 664 went "beyond traditional [embezzlement] concepts [to] impose[ ] liability for an intentional breach of special fiduciary duties imposed by other regulatory statutes or governing instruments." *See Andreen,* 628 F.2d at 1241. Reasoning that the ERISA Plaintiffs alleged a breach of fiduciary duties imposed by ERISA, the Court declined to dismiss the ERISA Subscribers' embezzlement-based RICO claims. Defendants now ask the Court to revisit this holding in light of *United States v. Wiseman,* 274 F.3d 1235 (9th Cir.2001).

*Wiseman* was concerned with the degree of scienter necessary to establish embezzlement from a pension fund and merely cited *Andreen* in passing for the proposition that because "embezzlement" under § 664 is given its "accepted definition," the district court correctly rejected a proposed jury instruction that would have required that the defendant know his conduct was illegal. *See Wiseman,* 274 F.3d at 1241 (citing *Andreen,* 628 F.2d at 1241). It thus added no material analysis to the question at hand.

 Nonetheless, upon further reflection, the Court agrees that predicate acts of embezzlement are not made out on these facts. "[T]he intended purpose of § 664 was to preserve welfare and pension funds for the protection of those entitled to their benefits." *Andreen,* 628 F.2d at 1240–41. Traditionally, embezzlement "encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent." *Id.* at 1241. And while *Andreen* recognized that § 664 extends this traditional concept to impose liability for intentional breach of special fiduciary duties imposed by "other regulatory statutes," each of the regulations discussed in *Andreen* concerned the proper management of a fund or trust. *See id.* at 1241–42 (citing 29 U.S.C. §§ 186(c)(5), 501(c)). *Andreen* also noted that the "common thread" uniting violations punishable under § 664 was that "the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done." *Id.* at 1241 (quoting *United States v. Silverman,* 430 F.2d 106, 126–27 (2d Cir.1970)). Finally, both *Andreen* and *Wiseman* involved situations in which moneys had been misappropriated or diverted from an established fund. *See Andreen,* 628 F.2d at 1242; *Wiseman,* 274 F.3d at 1239.

---

**5.** Section 664 of Title 18 of the United States Code provides that "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both."

The ERISA Subscribers fail to explain how by under-reimbursing them for ONS, WellPoint and the UHG Defendants "convert[ed] to [their] own use . . . any of the moneys . . . or other assets of any employee welfare benefit plan or employee pension benefit plan." *See* 18 U.S.C. § 664. The CTAC alleges that "[f]or fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from their own assets, Defendants benefited from the conversion of assets from their ERISA plans. Whereas these assets should have been held by WellPoint in its fiduciary capacities under ERISA and non-ERISA plans and paid to its members, WellPoint improperly withheld such funds and maintained them as part of its own assets for its own benefit. For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subscriber and Provider Subclasses in order to justify receipt of administrative fees." CTAC ¶ 432.

At bottom, this elaborate scaffolding amounts to nothing more than an allegation that WellPoint denied Subscribers healthcare benefits to which they purportedly were entitled under the terms of their plans. As the *Franco* court addressing the same argument noted, "Subscriber Plaintiffs allege that as to fully-funded plans, [WellPoint] paid claims from its own assets and, in underpaying, withheld its *own* funds. As to self-funded plans, no conversion at all is alleged; there, Subscriber Plaintiffs merely aver that [WellPoint] underpaid benefits to justify its receipt of administrative fees from the plan."

*See* 818 F.Supp.2d at 828. WellPoint is simply alleged to have decreased its own expenses, albeit improperly. There is no allegation, for example, that the Subscribers paid their premiums into a trust with the understanding that the funds paid in were reserved for ONS reimbursements, or that WellPoint's decision to artificially reduce its ONS payments somehow resulted in the improper diversion of moneys from any such fund. Although *Andreen* recognized that § 664 extends liability beyond traditional concepts of embezzlement under certain circumstances, to permit a cause of action for embezzlement on these facts would open the door to an embezzlement claim every time a participant brought a run-of-the-mill action for non-payment of benefits under ERISA § 1132(a)(1)(B). Nothing in either the facts or reasoning of *Andreen* justifies such an extension. Accordingly, the ERISA Plaintiffs' embezzlement-based RICO causes of action are DISMISSED.[6]

### 3. *RICO Conspiracy (Claim 8)*

Conspiring to violate RICO is a separate offense under 18 U.S.C. § 1962(d). "To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir.2000); *Couch v. Cate*, 379 Fed. Appx. 560, 567 (9th Cir.2010). Although a civil RICO plaintiff may sue co-conspirators who might not themselves have violated one of the substantive provisions of

---

**6.** These causes of action are dismissed against the UHG Defendants for the additional reason that the CTAC still fails to explain their involvement in any purported acts of embezzlement. *See August 11 Order*, p. 1035–36 ("There is no mention that UHG Defendants had a role in crafting the false or misleading statements, or any other involvement, and there is no mention that UHG Defendants had access to the health plans' funds, let alone that they converted those funds to their own use."). As the ERISA Plaintiffs have failed to remedy the defects identified by the Court, Plaintiffs' embezzlement-based RICO claims against the UHG Defendants are DISMISSED WITH PREJUDICE.

§ 1962, it is well established that a plaintiff may bring suit for civil conspiracy only if he has been injured by an action that is itself tortious. *See Beck v. Prupis,* 529 U.S. 494, 501, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). To this end:

> injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO [ ] is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d). As at common law, a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather, consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an act that is analogous to an "ac[t] of a tortious character," *see* 4 Restatement (Second) of Torts § 876, Comment b, meaning an act that is independently wrongful under RICO.

*Id.* at 505–06, 120 S.Ct. 1608.

In other words, a person injured by an overt act done in furtherance of a RICO conspiracy has no cause of action unless the overt act proximately causing his injury is itself an act of racketeering. *See id.* at 501, 120 S.Ct. 1608; *accord Bridge,* 553 U.S. at 650–51, 128 S.Ct. 2131.

Having failed to adequately plead a substantive violation of RICO, the Subscribers' necessarily have failed to plead that they were injured by an "overt act" that was itself a substantive RICO violation. *See Howard,* 208 F.3d at 751 ("Plaintiffs

cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *accord Stearns v. Select Comfort Retail Corp.,* No. 08–2746 JF, 2009 WL 1635931, at *15 (N.D.Cal. June 15, 2009). Accordingly, the cause of action for RICO conspiracy, too, is DISMISSED.

### C. *ERISA Claims*

The CTAC states causes of action for violations of ERISA under 29 U.S.C. §§ 1132(a)(1)(B), (a)(2), and (a)(3), as well as under § 1132(c).[7] The ERISA causes of action are pleaded against WellPoint only and are brought on behalf of the "ERISA Plaintiffs" and the "Association Plaintiffs on Behalf of their Members." The "ERISA Plaintiffs" include the "ERISA Subscriber" and the "ERISA Provider" Subclasses, which in turn are made up of "[a]ll persons or entities enrolled in ERISA-governed health insurance plans administered by WellPoint who paid for ONS and received reimbursements in an amount less than the billed charges on or after January 1, 1998," and "[a]ll Physicians who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint [who] were paid less than their billed charges," subject to certain exceptions. *See* CTAC, p. 126:18–127:13.

However, the Court has already determined that the CTAC fails to plead that

---

**7.** The Court dismissed Plaintiffs' cause of action under § 1132(c) without leave to amend in the *August 11 Order* on the grounds that while an insurer can properly be sued under § 1132(a)(1)(B) and § 1132(a)(3), "only the plan administrator can be held liable for failing to comply with [§ 1132(c)]." *See Vaught v. Scottsdale Healthcare Corp. Health Plan,* 546 F.3d 620, 633 (9th Cir.2008); 29 U.S.C. § 1132(c) ("*[a]dministrator's* refusal to supply requested information.") (emphasis added). Plaintiffs re-plead this claim "in an abundance of caution" in light of the purportedly unsettled state of the law regarding whether a Plaintiff must re-plead dismissed claims in subsequent iterations of a Complaint in order to preserve their dismissal for appeal. *See* CTAC, p. 141, fn.3. For the reasons set forth in the *August 11 Order,* this claim is again dismissed with prejudice.

the Providers were assigned the right to bring causes of action under §§ 1132(a)(2) and (a)(3) on behalf of their Subscriber-patients, and that the Associations lack representative standing to pursue claims that would be unavailable to their members suing in their own right. Accordingly, the Court considers the viability of the § 1132(a)(2) and (a)(3) causes of action with respect to the ERISA Subscriber Subclass only. With this in mind, the Court addresses each ERISA cause of action in turn.

1. *Section 1132(a)(1)(B) claims based on Non–Ingenix Methodologies*

 Defendants challenge the sufficiency of the ERISA Plaintiffs' § 1132(a)(1)(B) cause of action only as it relates to ONS reimbursements priced according to Non–Ingenix Methodologies. *See WellPoint Mot.* 3:18–21. Specifically, WellPoint argues that the CTAC fails to allege that Plaintiffs exhausted their administrative remedies with respect to the Non–Ingenix ONS reimbursement determinations, and otherwise fails to plead facts establishing that doing so would have been futile. As noted in the *August 11 Order*, "federal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and [ ] as a matter of sound policy they should usually do so." *See August 11 Order*, p. 1041 (quoting *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.1980)). An exception exists where a plaintiff can demonstrate futility of administrative appeals by pointing to a similarly situated plaintiff who exhausted his administrative remedies to no avail. *See Noren v. Jefferson Pilot Fin. Ins. Co.*, 378 Fed. Appx. 696, 698 (9th Cir.2010); *In re Managed Care Litig.*, 595 F.Supp.2d 1349, 1353–54 (S.D.Fla.2009) (finding class plaintiffs demonstrated the futility of administrative appeals because another plaintiff had unsuccessfully exhausted administrative remedies).

The Court previously found that Plaintiffs adequately pleaded the futility of administratively appealing ONS reimbursements priced using the Ingenix database in light of the experiences of "Subscriber X" and Dr. Peck, who allegedly appealed Ingenix-based determinations without success. Defendants argue that ERISA Plaintiffs whose ONS reimbursements were priced other than via Ingenix are not "similarly situated" to Subscriber X and Dr. Peck. *See WellPoint Reply*, 15:2–15. Plaintiffs counter that "exhaustion of remedies is typically an affirmative defense rather than a pleading requirement," *see Forest Ambulatory Surgical Assocs. v. United HealthCare Ins. Co.*, No. 10–CV–04911–EJD, 2011 WL 2748724, at *5 (N.D.Cal. July 13, 2011), and that having pleaded exhaustion or futility based on specific Plaintiffs' circumstances, "Plaintiffs were not required to distinctly plead exhaustion or futility as to each and every corrupt methodology used in the processing of their ONS benefit claims." *Opp.* 32:9:33–16.

Nonetheless, Courts in this Circuit have placed the burden on a "plaintiff seeking excuse from the exhaustion requirement [to] provide support for [the] excuse" at the motion to dismiss stage. *See Foster v. Blue Shield of Cal.*, No. CV 05–03324 DDP (SSx), 2009 WL 1586039, at *5 (C.D.Cal. June 3, 2009). The futility exception "is designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail." *Diaz v. United Agr. Emp. Welfare Benefit Plan and Trust*, 50 F.3d 1478, 1485 (9th Cir.1995). The named Subscriber Plaintiffs allege that their ONS reimbursements were improperly depressed via two Non–Ingenix Methodologies, namely, through the use of Medicare and "In–Network" fee schedules. *See* CTAC ¶¶ 337, 345. The Court does not think it imposes an undue burden at the pleading stage to require that the

ERISA Plaintiffs allege that *someone* unsuccessfully exhausted their administrative remedies with respect to a Non–Ingenix Methodology. Accordingly, Plaintiffs' ERISA claims based on the Non–Ingenix methodologies are DISMISSED.

### 2. *ERISA §§ 1132(a)(2), (a)(3) (third and fourth causes of action)*

■ Next, the ERISA Subscribers assert claims for breach of fiduciary duties under 29 U.S.C. § 1132(a)(2) and for failure to provide a full and fair review under 29 U.S.C. § 1132(a)(3). *See* CTAC ¶¶ 399–410. Both claims are based on WellPoint's "fail[ure] to disclose and [ ] affirmative steps to conceal that its reimbursement rates for out of-network medical expenses were based on False UCRs or other ONS Benefit Reductions that bore, and continue to bear, no relationship to the actual charges for those medical expenses." *See* CTAC ¶¶ 401, 406. WellPoint contends that these non-disclosure based claims must be dismissed because "[n]o ERISA provision or implementing regulation requires an insurer to provide every bit of data underlying a claim decision and details about the way in which that data was used." *See WellPoint Mot.* 33:22–25 (quoting *Franco,* 818 F.Supp.2d at 823). For the following reasons, the Court agrees.

The CTAC does not identify which statutory provisions WellPoint's non-disclosures are alleged to have violated in connection with the § 1132(a)(2) cause of action. In opposition, however, the ERISA Subscribers identify 29 U.S.C. § 1022(a)'s mandate that plan disclosures be "written in a manner calculated to be understood by the average ·plan participant," along with § 1022(b)'s requirement that "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" be disclosed.

Section 1022 deals with Summary Plan Descriptions ("SPDS"). Section 1022(b) lists certain information which must be disclosed, which Plaintiffs concede does not included UCR data. Further, the Court disagrees that this case involves the withholding of information pertaining to "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." [8] At most, Plaintiffs allege that WellPoint's use of the Ingenix database reduced Plaintiffs' reimbursement amounts for covered benefits—there is no allegation that the use of the Ingenix fee schedules led to any disqualifications, ineligibility determinations, or denials or losses of benefits. Accordingly, to the extent the ERISA Subscribers' § 1132(a)(2) claim relies on a violation of § 1022(b), that claim is deficient.

■ Plaintiffs correctly note that § 1022(a) requires that the SPD "be written in a manner calculated to be understood by the average plan participant, and [ ] be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *See* 29 U.S.C.

---

**8.** Plaintiffs also point to an implementing regulation requiring that "[a]ny description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits." 29 C.F.R. § 2520.102–2(b). This regulation is entitled "Style and format of summary plan description" and subpart (b) bears the heading "General format." *Id.* As the quoted language itself indicates, this regulation is concerned with ensuring that the physical appearance and format of an SPD presents its contents in an evenhanded manner, not with the substance of the SPD's disclosures. Accordingly 29 C.F.R. § 2520.102–2(b) is inapposite.

§ 1022(a); *accord Stahl v. Tony's Bldg. Materials, Inc.,* 875 F.2d 1404, 1406 (9th Cir.1989) ("A summary plan description 'must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries.'") (citation omitted). An ERISA fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information. *Bins v. Exxon Co. U.S.A.,* 189 F.3d 929, 939 (9th Cir.1999) ("[O]nce an ERISA fiduciary has material information relevant to a plan participant or beneficiary, it must provide that information."). In other words, "an ERISA fiduciary has both a duty not to make misrepresentations to plan participants, and an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *In re First Am. Corp. ERISA Litig.,* No. SACV 07–1357–JVS (RNBx), 2008 WL 5666637, at *5–6 (C.D.Cal. July 14, 2008) (citation and internal quotation marks omitted) (holding ERISA fiduciary had duty to disclose falsity of excerpts from incomplete and materially misleading SEC filings included in the SPD and other Plan documents).

According to Plaintiffs, WellPoint uses the phrase "usual and customary rates" other than how it would be readily understood by the average plan participant, *i.e.,* as "being what physicians usually and customarily charged for a certain procedure." *See Opp.* 34:15–21. Instead, WellPoint uses the term "as industry jargon for contrived numbers designed to cheat plan participants and physicians by paying them less than they were entitled to receive." *Id.* at 34:18–22.

Courts which have considered the scope of an ERISA fiduciary's disclosure obligations in similar contexts have overwhelmingly concluded that they do not extend to disclosure of UCR methodology or physician reimbursement schedules, and

that courts "should not add to the specific disclosure requirements that ERISA already provides." *See, e.g., Ehlmann v. Kaiser Found. Health Plan,* 198 F.3d 552, 555 (5th Cir.2000) (holding no duty to disclose physician reimbursement schedules under 29 U.S.C. § 1022); *Horvath v. Keystone Health Plan East, Inc.,* 333 F.3d 450, 461–63 (3d Cir.2003) (same); *accord Weiss v. CIGNA Healthcare, Inc.,* 972 F.Supp. 748, 754 (S.D.N.Y.1997) ("Had Congress seen fit to require the affirmative disclosure of physician compensation arrangements, it could certainly have done so in ERISA §§ 101–111. The general fiduciary obligations set forth in ERISA § 404 [also] do not refer to the disclosure of information to Plan participants, and it would be 'inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing' about such duties."); *Krauss v. Oxford Health Plans, Inc.,* 418 F.Supp.2d 416, 429 (S.D.N.Y.2005), *aff'd,* 517 F.3d 614 (2d Cir. 2008) (rejecting claim under § 1022 based on defendant's "failure to disclose how it calculates UCR limits," because "the Plan documents clearly disclose[d] that there may be some limitation on the amount of reimbursement, and in particular, where out-of-network providers are involved, that reimbursement will be limited to the lesser of the fee charged by the physician or the amount that Oxford determines to be reasonable"); *DeBartolo v. Blue Cross/Blue Shield of Ill.,* No. 01 C 5940, 2001 WL 1403012, at *7 (N.D.Ill. Nov. 9, 2001) (holding that information regarding "usual and customary charges" is not the type of information an ERISA plan administrator is required to disclose under 29 U.S.C. § 1024(b)(4)); *Franco,* 818 F.Supp.2d at 822–24 (rejecting claim brought under § 1022 and various other disclosure provisions of ERISA based on CIGNA's failure to disclose its UCR methodology, including

the flawed nature of the Ingenix Database).

Plaintiffs attempt to distinguish these cases on the grounds that they "do not allege that WellPoint failed to disclose the minutiae of how the reimbursement for every medical procedure was calculated," rather, "they allege that WellPoint was obligated to disclose, at a minimum, that its general UCR methodologies are corrupt and produce results that bear no reasonable relationship to actual 'usual and customary rates.'" *See Opp.* 34:3–5, 35:2–4. This represents an overly narrow construction of the precedent cited, which reflects a general unwillingness to extend an ERISA fiduciary's disclosure obligations beyond those enumerated by Congress. Given the weight of persuasive authority holding that a health insurer is under no obligation to disclose its UCR methodologies or physician compensation structure, combined with the ERISA Subscribers' failure to point to any authority supporting their position, the Court sees no reason to effectively let the same disclosure requirement in through the back door by requiring insurers to disclose that their "UCR methodologies are corrupt," at least where they sufficiently disclose that reimbursements for out-of-network services differ from reimbursements for in-network services, and may be capped according to some reimbursement methodology.

Finally, the Court notes that the only provision of ERISA discussed in connection with the ERISA Plaintiffs' cause of action under 29 U.S.C. § 1132(a)(3) is 29 U.S.C. § 1133. *See CTAC* ¶ 410. Section 1133 requires a plan to set forth its "specific reasons" for a denial of benefits, and mandates that participants be afforded the opportunity for a full and fair review of denied claims. Plaintiffs, however, appear to have abandoned § 1133 as a basis for their nondisclosure claims. *See Opp.* 32:7–37:21. For the foregoing reasons, Plain-

tiffs' §§ 1132(a)(2) and (a)(3) causes of action, which are premised exclusively on WellPoint's failure to disclose its methods for calculating UCRs, are DISMISSED.

### D. Breach of Contract (Claim 9)

█ WellPoint Defendants seek dismissal of the Non–ERISA Subscriber Plaintiffs' breach of contract claims because the new allegations purportedly demonstrate that the contracts are not uniform and because the contracts of Subscriber Plaintiffs J.B.W. and the Samsells were not breached. WellPoint's argument that the contracts lack uniformity is best left for a motion for class certification. *See CLN Properties, Inc. v. Republic Servs., Inc.*, No. CV–09–1428–PHX–DGC, 2010 WL 5146734, at *4–*5 (D.Ariz., Dec. 13, 2010). At the motion to dismiss stage, the Court considers only whether the individual claims of the representative plaintiffs are facially viable.

To state a claim for breach of contract, a plaintiff must plead (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff. *Troyk v. Farmers Gr. Inc.*, 171 Cal.App.4th 1305, 1352, 90 Cal.Rptr.3d 589 (2009). The CTAC adequately alleges the existence of contracts entered into between WellPoint and Plaintiffs J.B.W. and the Samsells, *see* CTAC ¶¶ 328–332, as well as Plaintiffs' performance. *See id.* ¶ 351. As to breach and damages, the allegations are as follows.

J.B.W.'s contract provides that WellPoint may reimburse for ONS in one of two ways depending upon the health care service at issue. For medical emergencies in California, J.B.W.'s agreement states that, for a non-participating provider, J.B.W. must pay "[a]ll charges in excess of Customary and Reasonable charges." *See* CTAC ¶ 334. A "Customary and Reason-

able Charge" is defined in J.B.W.'s agreement as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region." *Id.* Other ONS services, such as "Professional Services," are reimbursed at 50% of the "Negotiated Fee Rate." *Id.* The Negotiated Fee Rate, in turn, is defined as "the rate of payment that [WellPoint] has negotiated with the Participating Provider under a Prudent Buyer Participating Agreement for Covered Services." *Id.* While this language appears to reference an ONS reimbursement methodology tied to in-network fee schedules, Plaintiffs argue that because out-of-network providers by definition have not negotiated rates under a Prudent Buyer Participating Agreement or any other agreement, there can be no "rate of payment that [WellPoint] has negotiated with *the* Participating Provider." *Id.* (emphasis added). Thus, according to Plaintiffs, the reimbursement of ONS based on a Negotiated Fee Rate is nonsensical on its face unless there is some reference to a Customary and Reasonable Charge. *Id.* WellPoint allegedly breached these terms by "reimburs[ing] [J.B.W.] less than the agreed-upon percentage of either the provider's actual charges or the UCR," and by using internal fee schedules that "were derived with reference to Ingenix fee schedules and are not the result of any negotiation between WellPoint and Plaintiff J.B.W.'s providers, let alone any other providers." *Id.* ¶ 337.

■ These allegations are sufficient to withstand a motion to dismiss. J.B.W. adequately alleges that WellPoint breached the terms of his contract under either WellPoint's or his interpretation of the "Negotiated Fee Rate" by using Ingenix fee schedules that are not the result of any negotiations between WellPoint and J.B.W.'s providers or "any other providers," and which "do[ ] not reflect the rates applicable to those in-network providers

who actually negotiate fees with WellPoint." *See id.* ¶¶ 337, 177. J.B.W. was harmed as a result in that he was obligated to pay "that part of the provider's billed charge that exceeded the reimbursement amount determined by WellPoint." *Id.* ¶ 337.

■ WellPoint largely challenges J.B.W.'s theory of breach insofar as it disregards the policy's definition of "Negotiated Fee Rate" as "nonsensical on its face" and instead interprets that provision as requiring that WellPoint pay 50% "of either the provider's actual charges or the UCR." *See* CTAC ¶¶ 334, 337. Plaintiffs counter that the agreements do not define who *"the* Participating Provider" is with whom WellPoint has negotiated, and that, as the CTAC alleges, "WellPoint pays different rates to its in network providers, so there is no single rate applicable to *a* 'Participating Provider under a Prudent Buyer Participating Agreement.'" *See Opp.* 41:1–7 (citing CTAC ¶ 177). The Court finds that these allegations render the Negotiated Fee Rate reasonably susceptible to J.B.W.'s interpretation, thereby creating a contractual ambiguity sufficient to withstand the present motion to dismiss. *See Hervey v. Mercury Cas. Co.,* 185 Cal. App.4th 954, 962, 110 Cal.Rptr.3d 890 (2010) (noting that parol evidence is admissible to interpret an insurance policy if relevant to prove a meaning to which the language of the instrument is reasonably susceptible, and that if a plaintiff "alleges a meaning to the document that is reasonable in light of its terms," courts, at the very least, may decline to dismiss the breach of contract cause of action at the pleading stage). Moreover, in California, courts interpret coverage clauses broadly in favor of coverage and to protect the objectively reasonable expectations of the insured. *Id.* at 961, 110 Cal.Rptr.3d 890. For the foregoing reasons, WellPoint's mo-

tion to dismiss J.B.W.'s contract claim is DENIED.

 However, the Court agrees that the Samsells fail to state a claim for breach of contract. Under the terms of their policy, the amount that WellPoint would pay for an out-of-network Provider's charge, termed the "Allowable Charge," was defined circularly as either "the Company's allowance for a specified Covered Service or the Provider's charge for that service, whichever is less." *See* CTAC ¶ 342 (quoting Section C.1 of the Samsells' Plan). Although not disclosed to the Samsells, the Company's allowance was calculated based upon Anthem Virginia's standard, in-network participating fee schedule, which in turn was based on Medicare rates multiplied by a "dollar conversion factor." *See id.* ¶ 345. The CTAC expressly alleges that WellPoint determined the Samsells' "Allowable Charge" "based upon the above described out-of-network payment policy." *See id.* ¶ 348. Simply put, the Court fails to see how reimbursing a subscriber in accordance with the terms of a policy amounts to a breach of that policy. And while the CTAC also asserts that the provisions of the Samsells' policy quoted therein required WellPoint to make its discretionary ONS determinations "based upon actual review of itemized bills submitted by the Samsells' doctors," and not the in-network fee schedules, the Court's review of the provisions cited reveals no such limitation, and Plaintiffs otherwise fail to direct the Court to it is source. *See* CTAC ¶ 344 ("*These* Provisions . . . advised the Samsells that . . . 'Allowable Charge'. . . would be based upon the company's 'reasonable' determination based upon actual review of itemized bills submitted by the Samsells' doctors.") (emphasis added). Further, the only allegation of injury is that "the determination and subsequent payment of the 'Allowable Charge' for the Samsells' 'ONS' resulted in the Samsells being obligated to pay, and in fact paying, charges for out-of-network services that exceed the 'reasonable' charges for such services in the geographic area." *See* CTAC ¶ 348. But the Samsells do not tie this injury to any provision in the contract requiring WellPoint to pay an objectively reasonable ONS amount, as opposed to merely its "allowable charge" as set forth in the policy.

Accordingly, the Court finds that J.B.W. adequately states a claim for breach of contract, but DISMISSES the Samsells' breach of contract claim, with leave to amend.

### E. *Implied Covenant of Good Faith and Fair Dealing (Claim 10)*

WellPoint seeks dismissal of Plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing on the grounds that Plaintiffs have failed to state a claim for breach of contract, and none of the potentially applicable state laws purportedly recognizes an implied covenant claim independent of a breach of contract claim. However, as discussed above, J.B.W. adequately pleads a breach of his Agreement. Accordingly, WellPoint is not entitled to dismissal on this basis.

### F. *California Unfair Competition and False Advertising Claims (eleventh and twelfth causes of action)*

#### 1. *Eleventh Cause of Action*

 In the eleventh claim for relief, a single Subscriber Plaintiff, six Provider Plaintiffs and five Association Plaintiffs again state claims against WellPoint under each of the three prongs (fraudulent, unfair, and unlawful) of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), and under California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"). In the *August 11 Order*, the Court upheld Plaintiffs' "unfair"

and "unlawful" claims on the grounds that Plaintiffs had adequately stated a claim under the Sherman Act, but dismissed their fraud-based UCL and FAL claims because reliance had not been pleaded with the particularity required by Rule 9(b). *See August 11 Order,* p. 1049–50. Plaintiffs argue that the CTAC adds "more specifics" regarding WellPoint's deceptive conduct and its effect on Plaintiffs. *Opp.* 44:11–13. WellPoint again seeks dismissal of Plaintiffs' UCL claims under all three prongs.

The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," as well as any act prohibited by California's false advertising statute. *See Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,* 421 F.3d 981, 985 (9th Cir.2005) (quoting Cal. Bus. & Prof. Code § 17200). An "unlawful" business act under § 17200 is any business practice that is prohibited by law, whether "civil or criminal, statutory or judicially made . . . , federal, state or local." *McKell v. Washington Mut., Inc.,* 142 Cal.App.4th 1457, 1474, 49 Cal.Rptr.3d 227 (2006) (citations omitted). A business act is "unfair" under § 17200 "if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *See id.* at 1473, 49 Cal.Rptr.3d 227. Finally, a "fraudulent" business practice under § 17200 is "one which is likely to deceive the public," and "may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." *See id.* at 1471, 49 Cal.Rptr.3d 227. UCL claims based on fraud are subject to the heightened pleading requirements of Rule 9(b). *See Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124–25 (9th Cir.2009). Plaintiffs must plead "the who, what, when, where, and how of the alleged fraudulent conduct" and explain "why [a] statement or omission complained of was false and misleading." *In re Actimmune Mktg. Litig.,* No. C 08–2376 MHP, 2009 WL 3740648, at *6 (N.D.Cal. Nov. 6, 2009).

In addition, Plaintiffs must specifically allege that the fraudulent conduct caused them injury. *See In re Tobacco II Cases,* 46 Cal.4th 298, 327, 93 Cal. Rptr.3d 559, 207 P.3d 20 (2009); *Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 326, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011). This is really an issue of a plaintiff's standing to assert a UCL or FAL claim and requires a "twofold showing: he or she must demonstrate injury in fact *and* a loss of money or property caused by unfair competition." *Peterson v. Cellco P'ship,* 164 Cal.App.4th 1583, 1590, 80 Cal. Rptr.3d 316 (2008). Because "reliance is the causal mechanism of fraud," a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Kwikset,* 51 Cal.4th at 326–27, 120 Cal.Rptr.3d 741, 246 P.3d 877. Consequently, a plaintiff must show that the misrepresentation was an "immediate cause" of injury and that but for the fraudulent statements, "the plaintiffs in all reasonable probability would not have engaged in the injury-producing conduct." *In re Tobacco II,* 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20. This threshold is met where a plaintiff alleges "he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." *Kwikset,* 51 Cal.4th at 327 n. 10, 120 Cal. Rptr.3d 741, 246 P.3d 877.

Plaintiffs' fraud-based UCL cause of action arises from two distinct types of de-

ceptive conduct. First, WellPoint allegedly deceived Plaintiffs into purchasing plans providing ONS coverage by misrepresenting in its "advertising, promotional pamphlets and plan contracts that ... its members will be reimbursed for ONS based on either actual billed cost or the UCR," *see* CTAC ¶ 363, when, in reality, WellPoint "does not reimburse for ONS based on either the actual cost or the UCR, instead utilizing reimbursement rates it knows are artificially deflated." CTAC ¶ 364. These allegations also form the basis for Plaintiffs FAL cause of action. *See* CTAC ¶ 477 ("WellPoint [ ] knowingly disseminated untrue and/or misleading statements in an advertising or other device in order to sell or induce members of the public to purchase their health benefit plans and induce providers to administer healthcare services to its insureds, in violation of [Cal.] Bus. & Prof. Code § 17500."). Second, WellPoint induced Plaintiffs to utilize and pay more for ONS than was represented in the Agreements. *See* CTAC ¶¶ 364, 478. Both types of allegations sound in fraud, requiring them to be pleaded with particularity. *See Kwikset*, 51 Cal.4th at 327 n. 9, 120 Cal.Rptr.3d 741, 246 P.3d 877 (noting that where "statutory provisions [forming the basis of a plaintiff's 'unlawful' UCL claim] simply codify prohibitions against certain specific types of misrepresentations," the theory of the case sounds in fraud); *In re Actimmune*, 2009 WL 3740648, at *13.

With regard to the first type of deceptive conduct, the CTAC again fails to plead the "who, what, when, where, and how of the alleged fraudulent conduct" with sufficient particularity. *See Kearns*, 567 F.3d at 1125–26. The closest the CTAC comes to alleging a particular misrepresentation is the statement that:

> [WellPoint] publishes and widely disseminates on its website and through other media a summary description of its plans entitled 'Benefits-at-a-glance' in which it represents that is members will be reimbursed for ONS for certain procedures based on a specified percentage of the 'customary and reasonable fees' or 'negotiated fee rate.' "

CTAC ¶ 363.

However, there is no allegation that any Plaintiff relied on this statement, and the only averments actually tied to an individual plaintiff are deficient. For example, the CTAC alleges that "[b]ased on WellPoint's advertising, website, SPDs, and plan contracts," non-ERISA Subscriber Plaintiff J.B.W. "reasonably believed that [he] would be reimbursed for ONS based on valid, objective criteria and that such criteria would result in reimbursements that reflected the actual cost of ONS in their area." *See* CTAC ¶ 364. But J.B.W. does not identify the specific misrepresentation on which this belief was based, and therefore necessarily does not attempt to explain why it was false. *See Kearns*, 567 F.3d at 1125 (finding allegations that a defendant's "marketing materials and representations led [the plaintiff] to believe that CPO vehicle[ ] ... inspections were more rigorous" were deficient where the plaintiff failed to "specify what the [ ] advertisements or other sales material specifically stated," "or which ones he found material"). And although a plaintiff alleging exposure to a long-term advertising campaign is not required to "plead with an unrealistic degree of specificity ... [the] particular advertisements or statements" he or she relied on, *see In re Tobacco II Cases*, 46 Cal.4th at 328, 93 Cal.Rptr.3d 559, 207 P.3d 20, this exception does not swallow the rule and absolve plaintiffs in this action of their obligation to identify the purportedly misleading statements with particularity here. Conclusory allegations that "WellPoint advertises, promotes and sell[s its] health plans based on false, widely disseminated representations on its website, SPDs, and other promotion-

al materials" fall well short of the pervasive, decades-long advertising campaign described in the *In re Tobacco II Cases*.

■ J.B.W. does, however, adequately plead causation and injury by alleging that "because ONS was extremely important to Plaintiff J.B.W.," he was "enticed into becoming a member of WellPoint's plan based on his understanding that ONS would be available and affordable." *See Kwikset*, 51 Cal.4th at 328–30, 120 Cal. Rptr.3d 741, 246 P.3d 877 (observing that a plaintiff's reliance is shown by allegations that the substance of a misrepresentation "matters" to consumers, and causation and injury are satisfied by "alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation"); CTAC ¶ 364. Nonetheless, because J.B.W. fails to identify the statement that caused him to be misled into purchasing his policy and explain why it was false, J.B.W.'s fraud-based UCL claim based on the first type of conduct is inadequately pleaded on behalf of the non-ERISA Subscriber Plaintiffs.[9]

■ However, the Court finds that J.B.W. has adequately pleaded a fraud-based UCL claim under the second type of deceptive conduct—namely, that WellPoint induced him to purchase ONS based on the misleading price of ONS as represented in the contracts. *See* ¶¶ 332, 337, 462. The CTAC alleges that J.B.W.'s policy provided that he would be reimbursed based on either the "UCR" or the "Negotiated Fee Rate," depending on the service, but that WellPoint instead reimbursed him via fee schedules that were derived with reference to Ingenix fee schedules and which were not the result of any negotiation between WellPoint and any provider. *See* CTAC ¶¶ 334, 337. Finally, the CTAC pleads J.B.W.'s reliance on the misrepre-

sentation, alleging that "[h]ad J.B.W. ...been made aware of the true cost of ONS, [he] would have chosen less expensive in-network care instead." *See id.* ¶ 334. Accordingly, WellPoint's motion to dismiss J.B.W.'s fraud-based UCL claim is DENIED.

■ J.B.W.'s fraud-based UCL claim is the only such claim pleaded with any specificity. The Provider and Association Plaintiffs do not identify "the who, what, when, where, and how" of any misrepresentation on which they relied or explain "why the statement or omission complained of was false and misleading." *See In re Actimmune*, 2009 WL 3740648, at *6, *13. They also fail to specifically allege that the fraudulent conduct caused them injury. *See In re Tobacco II Cases*, 46 Cal.4th at 327, 93 Cal.Rptr.3d 559, 207 P.3d 20. Accordingly, with the exception of Plaintiff J.B.W., Plaintiffs again fail to plead viable fraud-based UCL claims, and such claims are DISMISSED.

Additionally, the Court concludes that Plaintiffs' "unfair" UCL cause of action requires dismissal. The Court previously declined to dismiss this claim on the grounds that Plaintiffs adequately pleaded a Sherman Act violation. *See August 11 Order*, p. 1049 ("A plaintiff can establish that a business practice [is] 'unfair' by showing that such conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'") (quoting *Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal.App.4th 1134, 1147, 135 Cal.Rptr.2d 796 (2003)). However, Plaintiffs' antitrust claims have now been dismissed. As Plaintiffs make

---

9. As noted, Plaintiffs' FAL cause of action relies on the same allegations as Plaintiffs' first type of deceptive conduct. *See* CTAC

¶ 477. Accordingly, Plaintiffs' FAL cause of action is DISMISSED for the same reasons.

no argument that their "unfair" UCL claim remains viable in the absence of a properly pleaded antitrust claim, Plaintiffs' "unfair" UCL claim is DISMISSED. *See Opp.* 47:15–19.

■ Lastly, the Court finds that Plaintiffs adequately plead a violation of the UCL's "unlawful" prong under the eleventh, but not the twelfth cause of action. An "unlawful" business act under § 17200 is any business practice that is prohibited by law, whether "civil or criminal, statutory or judicially made . . ., federal, state or local." *McKell,* 142 Cal.App.4th at 1474, 49 Cal.Rptr.3d 227. With respect to the eleventh cause of action, a "breach of contract may form the predicate for a section 17200 claim, provided it also constitutes conduct that is unlawful, or unfair, or fraudulent." *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1152 (9th Cir. 2008) (citation and internal quotation marks omitted). The CTAC adequately pleads a breach of J.B.W.'s contract, and that such breach amounted to a violation of California Insurance Code § 332, which requires that "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." *See* CTAC ¶ 472. Because Plaintiffs have adequately pleaded a breach of contract claim, and pleaded that the breach is independently unlawful under the California Insurance Code, the eleventh cause of action properly states a claim under the UCL's unlawful prong.

### 2. *Twelfth Cause of Action*

■ With regard to the twelfth cause of action, Dr. Schwendig and the California ER Provider Subclass argue their "unlawful" UCL claim is independently sustained based on a predicate violation of California's Knox–Keene Act. The Knox–Keene Act obligates emergency room providers to treat all emergency patients without regard to whether they are insured or their ability to pay. *See* Cal. Health & Safety Code § 1317. As a corollary to this requirement, health plans are required to "reimburse providers for emergency services and care provided to [ ] enrollees, until the care results in stabilization of the enrollee." *See id.* § 1371.4(b).

WellPoint attacks this cause of action exclusively on the grounds that it is preempted by ERISA. Specifically, WellPoint points out that Dr. Schwendig, who is categorized as an "ERISA Provider Plaintiff," is the only Provider Plaintiff alleged to have performed emergency services, and that all of the allegations regarding emergency services provided by him involve patients insured under ERISA plans. *See* CTAC ¶ 166, 226–32. Because these same facts serve as the basis for Dr. Schwendig's denial of benefits cause of action under ERISA § 1132(a)(1)(B), WellPoint argues that Dr. Schwendig's Knox–Keene Act claim is preempted and cannot form the basis for a derivative UCL claim. *See WellPoint Mot.* 46:12–47:22. And as the CTAC contains no other allegations supporting the California ER Providers' "unlawful" UCL claim, WellPoint contends dismissal is appropriate. For the following reasons, the Court agrees.

■ "There are two strands to ERISA's powerful preemptive force." *Cleghorn v. Blue Shield,* 408 F.3d 1222, 1225 (9th Cir.2005). First, ERISA section 514(a) expressly preempts all state laws "insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). A state law claim "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Sarkisyan v. CIGNA Healthcare,* 613 F.Supp.2d 1199, 1204 (C.D.Cal.2009).

But § 514(b), ERISA's savings clause, provides that "law[s] ... which regulate[ ] insurance, banking, or securities" are saved from ERISA preemption. *See* 29 U.S.C. § 1144(b)(2)(A). For a state law to be considered a "law which regulates insurance," that law must be "specifically directed toward entities engaged in insurance" and it must "substantially affect the risk pooling arrangement between the insurer and insured...." *Clark v. Group Hospitalization and Med. Servs., Inc.,* No. 10–CV–333–BEN (BLM), 2010 WL 5093629, at *4 (S.D.Cal., Dec. 7, 2010) (citing *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 342, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003)). Neither party crafts an argument with regard to whether § 1371.4, though clearly directed at insurance companies, may be said to "regulate" insurance by affecting the allocation of risk between the insurer and the insured. Accordingly, the Court declines to dismiss the Knox–Keene Act and derivative UCL claims on the grounds that they are defensively preempted by ERISA § 514(a). *See Cleghorn,* 408 F.3d at 1227 fn. 6 (reserving judgment on "whether California's section 1371.4(c) is excepted from preemption under section 514(b)(2)(A) as a state regulation of insurance") (citing *Kentucky Ass'n,* 538 U.S. at 334, 123 S.Ct. 1471); *Prospect Med. Grp., Inc. v. Northridge Emergency Med. Grp.,* 45 Cal.4th 497, 506, 87 Cal. Rptr.3d 299, 198 P.3d 86 (2009) (noting that a related provision of the Knox–Keene Act "expresses a legislative intent to '[help] to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers.'").

■■■ Second, a state claim "is completely preempted if (1) 'an individual, at some point in time, could have brought [the] claim under ERISA § [1132](a)(1)(B),' and (2) 'where there is no other independent legal duty that is implicated by a defendant's actions.'"

*Marin Gen. Hosp. v. Modesto & Empire Traction Co.,* 581 F.3d 941, 946 (9th Cir. 2009) (quoting *Aetna Health Inc. v. Davila,* 542 U.S. 200, 210, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004)) (commonly referred to as the "*Davila* test"). State law legal duties are not independent of ERISA where "interpretation of the terms of [the] benefit plan forms an essential part" of the claim, and legal liability can exist "only because of [the] administration of ERISA-regulated benefit plans." *Davila,* 542 U.S. at 213, 124 S.Ct. 2488. Plaintiffs do not challenge the first prong of the *Davila* test, but argue that the second prong cannot be satisfied because Dr. Schwendig and the ER Provider Subclass's claims arise from an independent state law duty imposed by Cal. Health & Safety Code § 1371.4(b).

The Ninth Circuit considered a similar issue in *Cleghorn v. Blue Shield of California,* 408 F.3d 1222 (9th Cir.2005). In that case, a health plan participant sued an insurer in state court, alleging violations of the UCL and other California laws. *Cleghorn,* 408 F.3d at 1224. The insurer removed the action to federal court, arguing that ERISA completely preempted all of the plaintiff's state-law causes of action. *Id.* In the plaintiff's motion to remand the action to state court, and on appeal, plaintiff argued that California's Knox–Keene Act provided an independent legal duty for the insurer to cover emergency treatment whenever the insured reasonably believed that it was required. *Id.* The Ninth Circuit rejected plaintiff's argument and held that any duty that the insurer had to reimburse for emergency services under the Knox–Keene Act was necessarily dependent on the fact that plaintiff was a participant in an ERISA-governed plan. *Id.* at 1226 ("Any duty or liability that Blue Shield had to reimburse him 'would exist here only because of [Blue Shield's] administration of ERISA-regulated benefit

plans." (quotation and citation omitted)). Accordingly, the plaintiff's "unlawful" UCL claim predicated on the Knox–Keene Act was preempted under *Davila*. *Id.*

The same is true here. Dr. Schwendig's UCL claim is based on the same allegations as his ERISA claim for benefits, and, as in *Cleghorn*, any obligation that WellPoint had to pay for emergency services is entirely dependent on Dr. Schwendig's patients—who are also WellPoint's members—being enrolled in a qualifying benefits plan. On these facts, Dr. Schwendig's claim "cannot be regarded as independent of ERISA." *See Cleghorn*, 408 F.3d at 1226. Thus, *Cleghorn* controls the outcome of this prong and Dr. Schwendig and the California ER Provider Subclass have not carried their burden to show "there is [some] other independent legal duty that is implicated by [WellPoint's] actions." *See Davila*, 542 U.S. at 210, 124 S.Ct. 2488.

*Marin General Hospital*, a case on which Plaintiffs rely, is not to the contrary. In that case, a hospital brought suit against an ERISA plan administrator asserting various state law causes of action, including breach of implied contract and breach of an oral contract. *See* 581 F.3d at 941. Before providing treatment, the hospital contacted the Plan Administrator who orally verified the patient's coverage, authorized the treatment, and agreed to cover 90% of the patient's medical expenses. *See id.* at 943. Addressing *Davila*'s second prong, the Ninth Circuit emphasized that the key determinant is whether "there is no other independent legal duty *that is implicated by a defendant's actions*[.] If there is some other independent legal duty beyond that imposed by an ERISA plan, a claim based on that duty is not completely preempted." *Id.* at 949 (citation and internal quotation marks omitted) (emphasis added). Distinguishing *Davila*, the Ninth Circuit reasoned that "[i]n this case, by contrast, the

Hospital contends that [the defendant] entered into an independent oral contract during the April 8 telephone call. The various state-law claims asserted by the Hospital all arise out of what was allegedly said during that call." *Id.* at 949–50.

Here, unlike *Marin General Hospital*, the CTAC's allegations with respect to WellPoint's conduct are limited to its administration of an ERISA-regulated plan. There is no allegation that Dr. Schwendig sought and received confirmation from a WellPoint representative that his patient's services would be covered, let alone that they would be covered at a specified percentage. Given the absence of any other conduct on the part of WellPoint that is independently actionable under state law, "[a]ny duty or liability that [WellPoint] had to reimburse [Dr. Schwendig] 'would exist here only because of [WellPoint's] administration of ERISA-regulated benefit plans.'" *See Cleghorn*, 408 F.3d at 1226. Therefore, this case properly falls under *Cleghorn* and Dr. Schwendig and the California ER Provider Subclass's twelfth cause of action for violation of the UCL's "unlawful" prong based on the Knox–Keene Act is completely preempted.

In summary, the Court DISMISSES Plaintiffs' "unfair" UCL claim, DISMISSES Plaintiffs' FAL claim, and DISMISSES Plaintiffs' "fraudulent" UCL claim, except to the extent it is brought by Subscriber Plaintiff J.B.W. Further, the Court DENIES WellPoint's motion to dismiss the UCL "unlawful" claim as stated in the eleventh cause of action, but GRANTS the motion to dismiss the twelfth cause of action as completely preempted.

## IV. *Conclusion*

The Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss and holds as follows:

1.) Plaintiffs have standing to their assert claims arising out of ONS benefit reductions priced according to the non-Ingenix methodologies.

2.) The Provider Plaintiffs' fail to plead they were assigned the right to pursue their subscriber-patients' claims under 29 U.S.C. §§ 1132(a)(2) and (a)(3), the Sherman Act, and RICO. Accordingly, these claims are DISMISSED WITH LEAVE TO AMEND. Moreover, because UCL claims based on assignments must be brought as class actions, the Providers' assignment-based UCL claims are DISMISSED WITH LEAVE TO AMEND and the Association Plaintiffs' representative UCL claims are DISMISSED WITH PREJUDICE.

3.) All Plaintiffs' Sherman Act and Cartwright Act claims are DISMISSED for lack of statutory standing. Dismissal is WITH PREJUDICE as to the Provider and Association Plaintiffs, and WITH LEAVE TO AMEND as to the Subscriber Plaintiffs.

4.) The Provider and Association Plaintiffs' RICO claims are DISMISSED WITH PREJUDICE.

5.) The Subscriber Plaintiffs' RICO cause of action predicated on mail fraud is DISMISSED against all Defendants for failure to plead reliance, DISMISSED against WellPoint for failure to plead that WellPoint conducted the affairs of the enterprise, and DISMISSED against UHG for once more failing to allege at least two predicate mailings. Dismissal is WITH LEAVE TO AMEND against WellPoint and Ingenix and WITH PREJUDICE against UHG.

6.) The ERISA Subscribers' embezzlement-based RICO cause of action is DISMISSED WITH LEAVE TO AMEND against WellPoint and DISMISSED WITH PREJUDICE against the UHG Defendants for failure to plead predicate acts of embezzlement.

7.) The RICO Conspiracy cause of action is DISMISSED WITH LEAVE TO AMEND for failure to plead a substantive violation of RICO.

8.) The Subscriber Plaintiffs' ERISA § 1132(a)(1)(B) cause of action based on the Non–Ingenix methodologies is DISMISSED WITH LEAVE TO AMEND for failure to allege exhaustion or futility.

9.) The Subscriber Plaintiffs' ERISA § 1132(a)(2) and (a)(3) claims, which are based exclusively on WellPoint's non-disclosure of its UCR methodology, are DISMISSED WITH LEAVE TO AMEND.

10.) The ERISA § 1132(c) cause of action is once again DISMISSED WITH PREJUDICE for the reasons set forth in the *August 11 Order.*

11.) The Court DENIES Defendants' Motion to Dismiss J.B.W.'s Breach of Contract claim, but GRANTS the motion to dismiss the Samsells' Breach of Contract claim WITH LEAVE TO AMEND.

12.) The Court DENIES Defendants' Motion to Dismiss Plaintiffs' Implied Covenant of Good Faith and Fair Dealing claim.

13.) With the exception of Plaintiff J.B.W.'s cause of action, Plaintiffs' fraud-based California Unfair Competition and False Advertising claims are DISMISSED WITH PREJUDICE.

14.) Plaintiffs' "unfair" UCL claim is DISMISSED WITH LEAVE TO AMEND.

932

15.) WellPoint's motion to dismiss Plaintiffs' eleventh cause of action for violation of the UCL's "unlawful" prong is DENIED; however, Plaintiffs' twelfth cause of action under the UCL's "unlawful" prong is DISMISSED WITH LEAVE TO AMEND as completely preempted.

All dismissals are WITH LEAVE TO AMEND, except where the Court has indicated that dismissal is WITH PREJUDICE. Plaintiffs may file a Fourth Amended Complaint no later than *November 1, 2012*.

**IT IS SO ORDERED.**